# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

CV 18    13474 JSC

[SUPPRESSED],

        Plaintiffs-Relators,

    v.

[SUPPRESSED],

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

Case No. _____

DEMAND FOR JURY TRIAL

**FILED IN CAMERA AND UNDER SEAL (Pursuant to 31 U.S.C. § 3730)**
**DO NOT PLACE ON PACER**
**DO NOT PLACE IN PRESS BOX**

## COMPLAINT

UNDER SEAL

FILED

MAR 0 1 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA, *ex rel.* GLORYANNE BRYANT and VICTORIA M. HERNANDEZ, | ) ) ) ) ) |
| Plaintiffs-Relators, | ) Case No. _____ ) |
| v. | ) DEMAND FOR JURY TRIAL ) |
| KAISER PERMANENTE, KAISER FOUNDATION HEALTH PLAN, INC., THE PERMANENTE FEDERATION, LLC, KAISER FOUNDATION HOSPITALS, THE PERMANENTE MEDICAL GROUP, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, COLORADO PERMANENTE MEDICAL GROUP P.C., SOUTHEAST PERMANENTE MEDICAL GROUP, HAWAII PERMANENTE MEDICAL GROUP, MID-ATLANTIC PERMANENTE MEDICAL GROUP, PC, NORTHWEST PERMANENTE PHYSICIANS & SURGEONS, P.C., and WASHINGTON PERMANENTE MEDICAL GROUP, | ) COMPLAINT FOR VIOLATIONS ) OF FEDERAL FALSE CLAIMS ) ACT AND CALIFORNIA FALSE ) CLAIMS ACT ) ) **[UNDER SEAL** PER 31 U.S.C. ) § 3730(b)(2)] ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

COMES NOW, Plaintiffs and *Qui Tam* Relators Gloryanne Bryant ("Ms. Bryant") and Victoria M. Hernandez ("Ms. Hernandez," and together with Ms. Bryant, "Relators"), individually and on behalf of the United States of America and the State of California, to recover treble damages and civil penalties under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and the California False Claims Act, California Government Code § 12651, et seq., for monies unlawfully obtained and/or retained from the federal Medicare Program and the California Medi-Cal Program by Defendant Kaiser Permanente and various of its direct and indirect subsidiaries and affiliates (together, "Kaiser" or the "Kaiser Defendants"), and allege as follows:

**INTRODUCTION**

The Kaiser Defendants are now and have been, in some cases since at least 2009, engaged in a widespread scheme to knowingly submit, or cause to be submitted, false claims for payment to the United States by submitting false "risk adjustment" information to the Centers for Medicare & Medicaid Services ("CMS") in order to improperly increase the amounts CMS pays them. Likewise, the Kaiser Defendants have knowingly retained overpayments received from CMS as a result of their false risk adjustment submissions.

1. Millions of elderly and disabled individuals throughout the United States receive their Medicare benefits through the Medicare Advantage Program (also referred to as "Medicare Part C"). A central, distinguishing feature of the Medicare Advantage Program is the provision of Medicare benefits by private healthcare insurance organizations. Medicare beneficiaries enroll in managed healthcare insurance plans called Medicare Advantage Plans ("MA Plans") that are owned and operated by these private organizations, called Medicare Advantage Organizations ("MA Organizations"). This case involves, in large part, conduct by Kaiser — which operates one of the nation's largest MA Organizations — to improperly obtain or avoid returning payments under the Medicare Advantage Program that it was not entitled to receive.

2. The Government pays each MA Organization a fixed monthly payment for each Medicare beneficiary enrolled in its plans. The Government adjusts these payments for various risk factors that affect expected healthcare expenditures, including the health status of each enrollee. The adjustments are intended to ensure that MA Organizations are paid more for those enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur lower costs.

3. To obtain payments based on adjustments for health status, MA Organizations submit diagnosis codes to the Government for the beneficiaries in their MA Plans. These diagnosis codes are from the beneficiaries' medical encounters (*e.g.*, office and hospital

visits). Using these diagnosis codes, the Government calculates a risk score for each beneficiary. The beneficiary's risk score is then used to calculate monthly payments to the MA Organization for that beneficiary for the following year. In general, the more numerous the conditions diagnosed, and the more severe the conditions, the higher the risk score for a beneficiary and, thus, the greater the risk-adjusted payments made to the MA Organization for that beneficiary.

4.      This payment model creates powerful incentives for MA Organizations to over-report diagnosis codes in order to exaggerate the expected healthcare costs for their enrollees. In order to combat these incentives and protect the Government from making erroneous payments to MA Organizations, the Government requires that submitted diagnoses be supported and validated by the beneficiaries' medical records. It is a well-established requirement that all diagnosis codes submitted to the Medicare Program for risk adjustment payments must be unambiguously supported by clinical documentation included in the beneficiaries' medical records. Kaiser knew that these medical records are the "source of truth" for the purpose of receiving and retaining risk adjustment payments, and for each individual member's medical history and clinical profile.

5.      In addition, each MA Organization must expressly certify in "Risk Adjustment Attestations" submitted to CMS that the diagnosis codes it has provided are accurate and truthful. 42 C.F.R. § 422.504(1)(2). Each MA Organization must also "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with [the Government's] program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse." 42 C.F.R. § 422.503(b)(4)(vi).

6.      In excess of one million elderly and disabled Medicare beneficiaries are currently enrolled in MA Plans that are owned and operated by Kaiser throughout the United States, and that number is growing. In 2011, approximately one million Medicare beneficiaries in

the United States were enrolled in Kaiser's MA Plans. In 2015, Kaiser's MA Plans had grown to 1.3 million beneficiaries, and in 2016 to 1.4 million.

7.     The United States also contributes to premiums paid by individuals to private health insurance companies, including Kaiser, under the Affordable Care Act (sometimes referred to as the "ACA").  The Affordable Care Act authorizes the Department of Health and Human Services (HHS) to utilize criteria and methods similar to those utilized under the Medicare Advantage program to implement risk adjustment, and requires similar attestations/certifications from health insurance companies as to the accuracy and documentation of their risk adjustment data. The HHS risk adjustment methodology developed by and on behalf of the Centers for Medicare & Medicaid Services ("CMS") is based on the premise that premiums should reflect the differences in plan benefits, quality, and efficiency, and not the health status of the enrolled population. Accordingly, as under the Medicare Advantage program, the ACA risk adjustment model creates powerful incentives for private health insurance companies like Kaiser to over-report diagnosis codes in order to exaggerate the expected healthcare costs for their enrollees; the more codes that are reported, the higher premiums the companies are permitted to charge, and the higher contributions will be made to such premiums by the United States.

8.     The United States pays billions of taxpayer dollars each year to Kaiser for the Medicare beneficiaries enrolled in its MA Plans and ACA Plans. Risk adjustment payments account for a substantial amount of these dollars. The diagnoses submitted by Kaiser drive a large percentage of the payments it receives from the Medicare Program. It is not surprising then that Kaiser is not a passive conduit of diagnoses from healthcare providers to the Medicare Program. Rather, for many years, Kaiser has conducted programs and engaged in other activities to increase the amount of risk adjustment payments from Medicare. This includes programs and other efforts to directly influence and capture both the number of diagnoses and the severity of the medical conditions reported by providers and coded by Kaiser staff.

9.     In addition to payments received from the United States pursuant to the Medicare Advantage and the ACA, Kaiser also receives government dollars through the Medi-Cal

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

program, which is the Medicaid program in California. California administers and partially funds the Medi-Cal program; the United States also contributes funds to Medi-Cal pursuant to the federal Medicaid program. Under Medi-Cal, eligible beneficiaries can enroll with managed care organizations like Kaiser for a capitated rate paid by Medi-Cal that provides at least those services provided to standard Medi-Cal beneficiaries. Kaiser hospitals and medical groups also provide and are paid by Medi-Cal for the provision of health care to Medi-Cal beneficiaries on a fee-for-service basis. Like Medicare Advantage and the ACA, payment and reimbursement under Medi-Cal depends, in part, on documentation and accurate coding. As relevant to the claims in this Complaint, managed care organizations like Kaiser and providers like Kaiser's hospitals and medical groups document and code the medical diagnoses and procedures received by each member/patient as a basis for payment/reimbursement, with the more serious diagnoses and procedures eligible for greater amounts. Kaiser systematically games this system as well, routinely and intentionally miscoding and over-coding the severity of diagnoses and procedures, and retaining overpayments from Medi-Cal arising therefrom.

10. Ms. Bryant, until her retirement on October 3, 2017, was National Director for Kaiser's national coding quality group, and, prior to that, was Managing Director of Kaiser's Health Information Management program ("HIM") for the Kaiser Foundation Health Plan in Kaiser's Northern California ("NCAL") region. Ms. Hernandez was employed by the Kaiser Defendants in various positions from June 1995 through October 2015, and as a Kaiser contract employee through May 2016, in functions that included Regional Director of auditing and coding services for The Permanente Medical Group in Kaiser's NCAL region.

11. In these positions, Relators discovered that the Kaiser Defendants were and are engaged in fraudulent schemes pursuant to which they routinely and systematically overcharge the following government programs in the following ways:

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

a.     Medicare Advantage

(i)     Defendants "upcode" risk adjustment claims by manipulating the documentation and submitting claims and codes to the Medicare Advantage program for diagnoses that the member does not have or for which the member was not treated in the relevant year, or by claiming that a member was treated for a more serious condition than the member actually has, or by documenting and submitting a diagnosis that was labeled significant when it was not, or by training, educating, and programming its personnel and systems to support these fraudulent activities; and

(ii)    Defendants refuse to implement and ignore processes to correct (and refuse to reimburse Medicare for) previously submitted risk adjustment claims when the Defendants discover, or in the exercise of reasonable care should discover, that those previously submitted claims were false, and subvert and ignore Kaiser's internal compliance function and pressure it to cooperate; and

(iii)   Defendants manipulate and falsify risk-adjustment data in a deliberate scheme to over-charge the Medicare Advantage program.

b.     Affordable Care Act

(i)     Similarly, Defendants overdocument and upcode risk adjustment claims relevant to individuals covered by the ACA in the same manner and pursuant to the same schemes as relevant to the Medicare Advantage program, and similarly refuse to correct or reimburse Medicare for overpayments caused by this conduct, in a deliberate scheme to over-charge the Medicare program;

c.     Medi-Cal

(i)     Defendants overdocument and upcode fee-for-service coded data submitted for Medi-Cal payment/reimbursement and data pertinent to determining the capitated rate for Kaiser's managed care organizations under Medi-Cal by similarly manipulating and falsifying diagnosis and procedure documentation and coding submitted to Medi-Cal; and similarly refuse to correct or reimburse Medi-Cal for these overpayments, in a deliberate scheme to over-charge Medicaid and the Medi-Cal program.

7

d.    Through this fraudulent scheme, the Kaiser Defendants have defrauded the United States and the State of California of hundreds of millions—and likely billions—of dollars for more than nine years.

12.    Defendants' conduct alleged herein violates the federal False Claims Act and, as pertinent to claims relating to over-charging the Medi-Cal program, the California False Claims Act. The federal False Claims Act (the "FCA") was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

13.    The FCA prohibits, inter alia: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these three sections of the FCA. 31 U.S.C. §§3729(a)(1)(A)-(C), and (G). Any person who violates the FCA is liable for a civil penalty of up to $21,916 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. §3729(a)(1).

14.    For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the

truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1). The FCA does not require proof that the defendants specifically intended to commit fraud. Id.  Unless otherwise indicated, whenever the words "know," "learn," discover" or similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

15.    Each claim for risk adjustment payments that defendants have submitted or caused to be submitted to CMS, where the patient was not treated by a qualified provider for that condition in the year in question, and/or the treatment and condition are not properly documented in the medical record is a false and/or fraudulent claim within the meaning of the FCA, so long as defendant knew that the claim was false when it was submitted, or the defendant later discovered its falsity and refused to correct the claim.

16.    The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

17.    Similarly, each claim for payment to the Medi-Cal program by Kaiser based upon documentation and codes that were manipulated or false, and which caused the Medi-Cal program to overpay the Defendants, is a false and/or fraudulent claim within the meaning of the California False Claims Act, which operates in a manner similar to the federal FCA, including providing for the recovery of treble damages and statutory penalties.

18.    Based on the foregoing laws, Relators Gloryanne Bryant and Victoria M. Hernandez seek, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made in

connection with false and/or fraudulent claims for Medicare Advantage risk adjustment payments, Affordable Care Act insurance premiums, and Medi-Cal capitated and fee-for-service payments.

### JURISDICTION

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

20.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, transacts business in, or has committed the alleged acts in the Northern District of California.

### VENUE AND INTRADISTRICT ASSIGNMENT

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in San Francisco County and Alameda County, and within the Division and Courthouse in which this action has been commenced.

### PARTIES

I.     PLAINTIFFS

22.     Plaintiff-Relator Gloryanne Bryant is an individual who, currently and during all times relevant to this action, resides in this judicial district. After her distinguished career in senior coding compliance positions with other California-based health care companies, Kaiser hired Ms. Bryant in May 2009 into a senior leadership position as Managing Director HIM for the Kaiser Foundation Health Plan, Northern California Revenue Cycle. Ms. Bryant remained at Kaiser until her recent retirement, effective as of October 3, 2017. In September 2013, Ms. Bryant was promoted to National Director Coding Quality, Education, Systems and Support for Kaiser's National Revenue Cycle Program Office, a position which she held until her retirement. Ms. Bryant is a nationally recognized expert and educator in coding, clinical documentation

10

improvement, and physician querying, and speaks and teaches regularly to state, regional, and national audiences. She holds professional designations of RHIA, RHIT, CCS, CDIP, and CCDS, and is an AHIMA-Approved ICD-10-CM/PCS Trainer.

23.    Plaintiff-Relator Victoria M. Hernandez is an individual who, currently and during all times relevant to this action, resides in this judicial district. Ms. Hernandez is a coding professional with over 23 years of experience in the healthcare field. She was employed by the Kaiser Defendants in various coding leadership positions from January 2000 through October 2015, including:  (i) Regional Director of Auditing & Coding Services for TPMG from October 2014 through October 2015; (ii) Regional Director of Hospital Coding Audit & Education for Kaiser Foundation Health Plan from April 2012 through October 2014; and (iii) Regional Coding Review Manager for Kaiser Foundation Health Plan's Revenue Cycle HIM from February 2010 through April 2012. She holds professional designations of RHIA, CDIP, CCS, CCS-P and is an AHIMA-Approved ICD-10-CM/PCS Trainer.

24.    The United States and the State of California, on whose behalf Relator brings this suit, are the real parties in interest. The United States has ongoing contracts with Defendants through CMS, in accordance with Defendants' participation in the Medicare and Medicaid programs. The State of California has ongoing contracts with Defendants through the Medi-Cal program, in accordance with Defendants' participation in the Medicaid program.

## II.    THE DEFENDANTS

25.    Kaiser Permanente is a healthcare consortium that operates one of the nation's largest health plans, serving over 11 million members. Kaiser employs doctors and other medical professionals and provides medical services through its Permanente Medical Groups, a for-profit set of regional affiliates that includes The Permanente Medical Group ("TPMG") in Northern California, Southern California Permanente Medical Group ("SCPMG") in Southern California, and five other regional areas including Hawaii, the Pacific Northwest, Colorado, Georgia and the Mid-Atlantic States. Kaiser owns and operates acute care hospitals in four

regions (Northern California, Southern California, Northwest and Hawaii), and provides care in other settings through its non-profit Kaiser Foundation Hospitals ("KFH").

26.     Kaiser's private health insurance plan covers the majority of its patient population.   Kaiser also operates, however, various MA Plans through its subsidiary Kaiser Foundation Health Plan, Inc., including its Medicare Advantage HMO plans called "Senior Advantage," serving approximately 1.4 million members in approximately seven states and one district in 2016.   Kaiser's Medicare Advantage Program serves approximately 10% of Kaiser's overall patient population (10.7 million total as of 2016), but generates approximately 30% of Kaiser's overall profits.  Kaiser's Medicare Fee-for-Service program, which includes charges to the Medi-Cal program, serves approximately 1-3% of its patient population.

27.     Kaiser reported overall operating revenue of $64.6 billion in 2016, compared to $60.7 billion in 2015.  Kaiser reported net income of $3.1 billion in 2016, compared to $1.9 billion in 2015.

### Kaiser Permanente Total Health Plan Membership, by Region (as of early 2017)

| | |
|---|---|
| **Northern California:** | 4,134,194 |
| **Southern California:** | 4,390,653 |
| **Colorado:** | 671,500 |
| **Georgia:** | 306,806 |
| **Hawaii:** | 250,221 |
| **Mid-Atlantic States (Va., Md., D.C.):** | 702,516 |
| **Northwest (Ore./Wash.):** | 575,688 |
| **Washington:** | 677,050 |

Source:  https://share.kaiserpermanente.org/article/fast-facts-about-kaiser-permanente/

28.     Pursuant to inter-company agreements, the Kaiser Foundation Health Plan, Inc. shares moneys received from federal and state governments with Kaiser's various Permanente Medical Groups and Kaiser Foundation Hospitals.   Accordingly, all of the named Kaiser Defendants possess financial interests in maximizing the amounts claimed to and paid by the governments, and each Kaiser Defendant has participated in various aspects of the fraudulent practices, as described further herein.

29.     Defendant Kaiser Foundation Health Plan, Inc. is a California corporation with its principal place of business in Oakland, California within this judicial district.

30.     Defendant The Permanente Federation LLC is a Delaware corporation with its principal place of business in Oakland, California within this judicial district.

31.     Defendant Kaiser Foundation Hospitals is a California corporation with its principal place of business in Oakland, California within this judicial district.

32.     Defendant The Permanente Medical Group, Inc. ("TPMG") is a California corporation with its principal place of business in Oakland, California within this judicial district. TPMG operates all Kaiser medical group operations in the Northern California region ("NCAL region").

33.     Defendant Southern California Permanente Medical Group, Inc. ("Southern California PMG" or "SCPMG") is a California corporation with its principal place of business in Pasadena, California.   SCPMG operates all Kaiser medical group operations in the Southern California region ("SCAL region").

34.     Defendant Colorado Permanente Medical Group, P.C. ("Colorado PMG") is a Colorado corporation with its principal place of business in Denver, Colorado.   The Colorado PMG operates all Kaiser medical group operations in the Colorado region.

35.     Defendant The Southeast Permanente Medical Group, Inc. ("Southeast PMG") is a Georgia corporation with its principal place of business in Atlanta, Georgia.   The Southeast PMG operates all Kaiser medical group operations in the Southeast region.

36.     Defendant Hawaii Permanente Medical Group, Inc. ("Hawaii PMG") is a Hawaii corporation with its principal place of business in Honolulu, Hawaii.  The Hawaii PMG operates all Kaiser medical group operations in the Hawaii region.

37.     Defendant Mid-Atlantic Permanente Medical Group, PC ("Mid-Atlantic PMG") is a Maryland corporation with its principal place of business in Rockville, Maryland.  The Mid-Atlantic PMG operates all Kaiser medical group operations in the Mid-Atlantic region, including Georgia.

38.     Defendant Northwest Permanente, P.C. ("Northwest PMG") is an Oregon corporation with its principal place of business in Portland, Oregon. The Northwest PMG operates all Kaiser medical group operations in the Northwest region, including Oregon.

39.     Defendant Washington Permanente Medical Group, Inc. ("Washington PMG") is a Washington corporation with its principal place of business in Seattle, Washington. The Washington PMG operates all Kaiser medical group operations in the Washington region.

40.     TPMG, Southern California PMG, Colorado PMG, Southeast PMG, Hawaii PMG, Mid-Atlantic PMG, Northwest PMG, and Washington PMG are referred to collectively herein as "The Permanente Medical Groups" or "PMGs".  Unless stated otherwise, references to Kaiser actions or conduct taking place in a particular Kaiser region refers to the actions or conduct of the specific Permanente Medical Group that operates in that region.

## THE LAW

### A.     *Medicare Advantage (Medicare Part C)*

41.     Under Medicare Part C, the Medicare Program pays each MA Organization a predetermined monthly amount for each Medicare beneficiary in the plan. This monthly payment is known as a "per-member, per-month" payment (or "PMPM"). This capitated payment for each plan varies depending on various factors, including amounts set forth in the plan's bid submitted to CMS. Since 2000, Congress has also required that the payments be risk adjusted for each beneficiary based on demographic factors (*e.g.*, gender, age) and health status. By risk adjusting

14

for health status, Congress required that more be paid for beneficiaries with higher risk scores than be paid for beneficiaries with lower risk scores. CMS currently employs a health-based risk adjustment model — known as the Hierarchical Conditions Category ("HCC") model — that takes into account diagnoses from inpatient hospital stays, emergency and outpatient surgery encounters, and physician office visits.

42.     The HCC model is prospective, meaning that it relies on diagnoses for certain medical conditions assigned to beneficiaries by their physicians in a one calendar year timeframe (referred to by CMS as the "data collection" year but also generally known as the "date of service" or "DOS" year) to set the payment for each beneficiary for the following year (often referred to as the "payment year" or "PY"). The medical conditions included in the model are grouped into HCCs, which are categories of clinically-related medical diagnoses. *See* 42 C.F.R. § 422.2. The diagnoses grouped into HCCs include major, severe/acute, and/or chronic illnesses. Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment. Between 2004 and 2013, the CMS-HCC model included 70 HCCs. Starting in 2014, the CMS-HCC model included 79 HCCs.

43.     The Government assigns a relative numerical value/weight to each HCC group that correlates to the predicted incremental costs of care associated with treating the medical conditions in each category. It determines the relative values based on the amounts that it paid to fee-for-service providers to treat these major, severe, and chronic medical conditions under Parts A and B of the Medicare Program. Higher relative values/weights are assigned to HCCs that include diagnoses with greater disease severity and greater costs associated with their treatment.

44.     As previously stated, the HCC risk adjustment model is prospective and a beneficiary's risk score for a particular payment year is determined by his or her medical conditions during the previous year (*i.e.*, the date of service year). These medical conditions must be documented by a qualified healthcare provider (*e.g.*, a doctor, physician's assistant, etc. as defined by the CMS MA program) in the beneficiary's medical record during the previous year.

45.     Each beneficiary's risk score is calculated anew for each payment year. For example, a beneficiary's risk score for payment year 2012 is determined by the diagnoses that his

15

or her qualified healthcare providers documented in his or her medical records during face-to-face medical encounters during date of service year 2011.

46.     MA Organizations obtain diagnosis data from the healthcare providers that treat the beneficiaries in their plans. Healthcare providers can transmit diagnosis codes to MA Organizations with claims for payment for services rendered, in encounter records reporting the services rendered, or by alternative means.

47.     MA Organizations submit risk adjustment data, including diagnoses, to CMS using CMS' Risk Adjustment Processing System ("RAPS"). Each RAPS submission must include the following information: the Medicare beneficiary's identification number (called a "HIC number" or "HICN"); the date(s) of the medical encounter; the type of provider (physician or hospital); and the diagnosis code(s) reported by the provider for the encounter. Medical encounters include physician office visits, hospital outpatient visits, and hospital inpatient stays.

48.     MA Organizations are entitled to risk adjustment payments based on the diagnosis codes that they submit to CMS only if the codes are from face-to-face medical encounters between the Medicare beneficiary and provider, the encounter occurred during the relevant date of service year, the provider was of a type and specialty acceptable for risk adjustment purposes, and at the time of the encounter, the provider  documented the medical conditions identified by the diagnosis codes in the medical record based on acceptable documentation. In addition, codes should be based on documented conditions that require or affect patient care treatment or management. *See* 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participation Guide") at § 6.4.1.

49.     Risk adjustment claims are true, and the resulting risk adjustment payments are valid, only to the extent that the diagnosis codes submitted by the MA Organizations are valid. The diagnoses must be coded according to the *International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting* ("ICD-9- CM" & "ICD-10-CM") and documented with sufficient clinical specificity. All diagnosis codes submitted by MA Organizations must be supported by medical record documentation. If the medical record is ambiguous, it cannot be relied on for diagnosis information for risk adjustment payments. *See*

16

2008 RA Participation Guide at § 7.2.4.1 (stating that risk adjustment claims and payments cannot be based on questionable diagnoses).

50.    MAOs have a statutory obligation to report and return any overpayment received from the Government, 42 U.S.C. § 1320a-7k(d).  Further, federal regulations are clear that MAOs like Kaiser are required to report and return both overpayments that they have identified and overpayments that they "should have determined through the exercise of reasonable diligence" were made by CMS.  42 C.F.R. 422.326(c).  The law is clear that any overpayment retained after the statutory deadline of 60 days is an "obligation" for purposes of 31 U.S.C. § 3729. 42 U.S.C. § 1320a-7k(d)(4)(B) (defining overpayments); 42 C.F.R. 422.326(e).

**B.    *Affordable Care Act ("ACA")***

51.    The Affordable Care Act sets up a program of risk adjustment in individual and group markets to lessen or eliminate the influence of risk selection on the premiums that plans charge. In the risk adjustment model utilized under the ACA, which is named the HHS-Hierarchical Condition Categories ("HHS-HCC") risk adjustment model, HHS utilizes criteria and methods similar to those utilized under the Medicare Advantage program, and adapts Medicare Advantage HCCs for use in the HHS-HCC model.  The chief goal in the design of the HHS-HCC model is to assure that premiums reflect differences in benefits and plan efficiency.  The HHS-HCC model uses current year diagnoses and demographics to predict the current year's spending, as distinguished from the Medicare Advantage program, which uses the risk adjustment model to predict next year's spending.  But in the end, the effect of risk adjustment on ACA premiums is similar to the impact of risk adjustment on capitated payments made under the Medicare Advantage program.  Insurers like Kaiser receive more ACA premiums the more documented and coded conditions are submitted for their insureds.

52.    Pursuant to the ACA, the United States contributes, through tax credits, to premiums paid by low-income individuals to private health insurance companies, including Kaiser, based upon a sliding scale calibrated to the poverty line.  Accordingly, when premiums are artificially high due to documentation and coding fraud, both enrollees and the United States are harmed by the overcharges.

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

### C.   *Medi-Cal*

53.    Medi-Cal's capitated and fee-for-service rates, like payments made under Medicare Advantage and the ACA, depend, in part, on documentation and accurate coding by managed care organizations like Kaiser and providers like Kaiser's hospitals and medical groups. These organizations and providers document and code the medical diagnoses and procedures received by each member/patient as a basis for payment/reimbursement, with the more serious diagnoses and procedures eligible for greater amounts. Miscoding and over-coding of the severity of diagnoses and procedures thus causes the Medi-Cal program to overpay.

### THE FACTS

**I.    KAISER AND ITS RELATED COMPANIES OVERDOCUMENT AND OVERCODE/UPCODE "HIGH-VALUE" HIERARCHICAL CONDITION CODES ("HCCS")**

54.    Ms. Bryant and Ms. Hernandez have witnessed Kaiser and its related companies engage in systematic fraud on the Medicare Advantage program, and other government programs including the ACA and Medi-Cal, for many years through teaching and implementing "HCC maximization techniques" to physicians and coding staff, resulting in systematic over-documenting, over-coding and upcoding of certain high value HCCs, as detailed below. The HCCs directly impact risk adjustment scores, meaning that the Government overpays Kaiser for its patient population which is not as sick as Kaiser reports.

55.    Kaiser submitted a Risk Adjustment Attestation to the Medicare Program each year after the final risk adjustment submission deadline and knew that it was required to submit a truthful Risk Adjustment Attestation. Despite its obligations under Medicare law, Kaiser's documentation, coding and Risk Adjustment Attestations have been false.

### A.    *Aortic Atherosclerosis ("AA")*

#### (i)    *Clinical significance, documentation and coding convention*

56.     AA is sometimes referred to as "hardening of the arteries."  It describes a thickening and loss of elasticity in the arterial wall.  This condition is often an incidental finding in radiology and imaging reports and neither treated nor managed after being identified.  It often has no impact on patient care or outcomes.   Unless AA is related to signs, symptoms or conditions/diagnoses that necessitated the performance of the radiology and imaging test, treatment and management is actually directed toward the AA, or a follow-up office visit is ordered for treatment, it should not be reported/coded to Medicare.

57.     For example, the American Hospital Association's ("AHA") Coding Clinic, the official clearing house for ICD-9-CM and ICD-10-CM/PCS coding guidance, publishes the following guidance for outpatient encounters, including emergency room visits:   "It is inappropriate to report an incidental finding found on a radiology report when the finding is unrelated to the sign, symptom, or condition that necessitated the performance of the test for a patient being seen in the emergency department (ED).  The ED physician would need to clarify that the finding was clinically significant and related to the visit in order for it be coded."  *See* Exhibit 1.

58.     Official Coding and Reporting Guidelines applicable to inpatient encounters further confirm the standard:

encounters for diagnostic tests that have been interpreted by a provider.

When it is coded, AA is currently assigned ICD-10-CM code 170.0 (Atherosclerosis of Aorta). Under ICD-9-CM, AA was assigned ICD-9-CM code 440.0 (Atherosclerosis of Aorta). The AA diagnosis is assigned to HCC 108; in 2016, Kaiser received approximately $2,260 for each HCC 108 code.

(ii)    *Kaiser's scheme*

59.     Labeled an "area of significant missed opportunity" by Kaiser's Medicare Finance Group and Kaiser's Permanente Medical Groups, Kaiser implemented an HCC initiative in 2011 to review and capture AA diagnoses in all clinic, emergency, outpatient surgery, and inpatient encounters, even when incidental to the encounter.  In Kaiser's NCAL region, Kaiser

subsidiary TPMG trained its physicians to choose a diagnosis from Kaiser's proprietary, electronic diagnosis "pick list" to capture AA, even when it was merely an incidental finding.

60.     Kaiser's TPMG senior clinician leaders took the position that AA is a "chronic, systemic condition" that is a permanent risk factor once diagnosed, and thus is properly codeable regardless of its actual significance or treatment.  This interpretation, if accurate, would result in the AA diagnosis meeting the Official Coding and Reporting Guideline for the coding of a systemic condition without coding staff questioning it. Kaiser's NCAL TPMG region directed Regional Health Information Management ("Regional HIM") coding leaders to instruct and train to "always code" AA on the basis that it was supposedly a systemic condition and should always be coded. This direction and instruction ignored coding conventions and guidance, and internal feedback from Kaiser NCAL's Regional HIM, including Ms. Bryant and Ms. Hernandez who questioned whether this condition was truly systemic.  This improper TPMG direction was eventually migrated to Kaiser's other regions as a "best practice."

61.     Kaiser's NCAL Regional HIM, led by Ms. Bryant, remained uncomfortable with the TPMG instruction on AA.  Ms. Bryant had numerous conversations with individuals within TPMG and others within Kaiser regarding her and her colleagues' concerns, and submitted a written inquiry to AHA Coding Clinic as to whether the diagnosis of AA is properly considered a chronic, systemic condition (similar to hypertension and diabetes mellitus) that is codeable on a routine basis even in the absence of treatment, management, and/or monitoring.  The guidance received from AHA Coding Clinic subsequently rejected NCAL TPMG's clinical determination. But TPMG management exerted intimidation, pressure and other undermining techniques to silence Ms. Bryant and her Regional HIM staff.

62.     To provide "documentation" that would constitute evidence of the clinical significance of AA and meet the Official Coding and Reporting Guidelines, Kaiser's NCAL TPMG region developed a "SMARTPHRASE" to automatically populate the medical record when AA was observed and/or diagnosed in radiology and imaging reports that would routinely, automatically, and falsely state that the diagnosis was significant, not incidental, and would

1  require clinical follow-up.  This process was implemented so that the hospital coding staff would

2  assign the ICD-9-CM code for AA, and the HCC for AA would be captured.

3      63.    Ms.  Bryant  continued  to  bring  her  concerns  to  Kaiser's  National

4  Compliance Ethics & Integrity Office ("National Compliance Office" or "NCO") and finally, in

5  August 2015, Kaiser NCO announced that a Kaiser Permanente ("KP") clinical review overruled

6  NCAL TPMG's clinical determination that AA is a chronic, systemic condition that should always

7  be coded.  But three years had passed and hundreds of thousands of inaccurate, false codes entered

8  before that belated direction was issued.  There was no discussion of or action plan developed to

9  address the inaccuracies of the past with the AA diagnosis and HCC capture.

10     64.    Kaiser coded data reports from 2010-2016 shows that the increased AA

11 diagnosis-capture scheme worked – AA diagnoses and coding increased four- and five-fold across

12 all Kaiser regions over that period and spread to all patient populations and payers.

13     **(iii)**    ***Chronology and evidence***

14

15     65.    In late 2011, members of Kaiser's National Compliance Office and NCAL

16 Revenue Cycle teams for The Kaiser Foundation Health Plan and Hospitals ("NCAL KFHP")

17 focused attention on the accurate coding of AA as a result of internal inquiries and requests for

18 guidance.  After an exchange of emails, members of these teams, including Ms. Bryant and Ms.

19 Hernandez, drafted and published a memo to all Regional HIM Directors and hospital Coding

20 Staff in March 2012 outlining the <u>correct</u> coding convention for AA.  *See* <u>Exhibit 2</u>.  The memo

21 correctly stated that AA should not be coded except under certain limited conditions (see above).

22     66.    TPMG Director Anne Cadwell, NCAL Revenue Cycle VP David Nyburg,

23 and TPMG Physician Liaison Dr. David Bliss reacted unfavorably to this memo immediately.  In

24 calls with Ms. Bryant, they took the position that AA "is always significant and a risk factor so

25 thus they will teach the MDs to document that so it will be coded."  *See* <u>Exhibit 3</u>.  Ms. Bryant

26 noted that she was "troubled" by this approach in an email to Janet Franklin, Kaiser's Senior

27 Compliance Practice Leader in its National Compliance Office.  *Id.*  Ms. Hernandez and other

28

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

1  HIM coding leaders shared Ms. Bryant's concern. No definitive guidance was provided nor action
2  taken by Kaiser's National Compliance Office.

3      67.     In 2012, TPMG trained its doctors to document AA as if it were always
4  significant, and KFH hospital coding staff to always code AA, as directed by Dr. Bliss and other
5  TPMG Directors (*e.g.*, Anne Cadwell, Karen Graham, and Erica Eastham).  In a December 3,
6  2012 email, TPMG's Ms. Cadwell wrote to Ms. Bryant and Ms. Hernandez that she was concerned
7  that Kaiser Hospital coding staff was not getting the communication about AA:  "We need to get
8  everyone on the same page that AA is **not** an incidental finding from a clinical perspective." *See*
9  Exhibit 4 (emphasis in original).  Ms. Bryant and Ms. Hernandez felt that they were being strongly
10  pressured to violate coding guidelines and to participate in manipulating documentation and codes.

11      68.     During a December 12, 2012 WebEx/call with TPMG, TPMG Director Ms.
12  Cadwell told NCAL HIM Leadership that the NCAL region would develop and implement a
13  "SMARTPHRASE" for its doctors to add to patients' electronic files (*e.g.*, in their EPIC electronic
14  health records, called "KP Health Connect") whenever AA was found on a radiology report in
15  order to indicate its significance. It was requested that NCAL HIM leadership approve this
16  documentation so that AA would be "always coded." *See* Exhibit 5 (WebEx meeting invitation).

17      69.     The "SMARTPHRASE" developed by TPMG in Kaiser's NCAL region
18  stated as follows: "Aortic Atherosclerosis noted on review of the radiology exam associated with
19  chart review and this visit. Will follow longitudinally as an independent risk factor for CVD and
20  CVA, with management per standard risk factor controls over time by PCP or appropriate
21  specialist." *See* Exhibit 6 at REL0000061. This phrasing was developed in an attempt to satisfy
22  the numerous concerns raised by NCAL HIM Leadership (*i.e.*, Ms. Bryant and Ms. Hernandez)
23  that documentation of AA was required, including language of clinical significance, to pass audit
24  and/or coding compliance testing. But it was clinically false and misleading.  AA can be clinically
25  insignificant and incidental and should not always be coded, but Kaiser was training its physicians
26  to always document the clinical significance of the findings so as to cause coders to always code it
27  without question.   In December 2012, NCAL HIM was still waiting for Kaiser's National
28  Compliance Office to provide definitive guidance.   In the meantime, Ms. Bryant and Ms.

22

Hernandez made repeated but futile attempts to help TPMG leadership understand the compliant and appropriate documentation for the coding of AA.

70.     By January 2013, Dr. Bliss, TPMG Director Ms. Cadwell and other senior management had fully overridden the coding memo issued in March 2012 by NCAL HIM Leadership.  Summarizing Kaiser NCAL's new directive for coding AA in the hospital setting, Ms. Bryant emailed Kaiser's National Compliance personnel, including Ms. Franklin, as follows (copying Ms. Hernandez) to alert NCO as to the new direction in the NCAL region:  "TPMG takes the position that once AA is present it never goes away and is then a lifelong risk factor ....  We (NCAL) do believe that AA meets the criteria to be reportable and does impact care and decision making.  To go further with this discussion I believe needs individual with greater clinical knowledge like physicians and would invite TPMG *i.e.* Dr David Bliss) [sic] to discuss this further."  *See* Exhibit 7.  Kaiser's National Compliance Office did nothing to stop this new direction.

71.     In fact, Ms. Bryant was required to be "supportive," "collaborative," and a "partner" with TPMG's direction for capturing the AA HCC by putting together an educational power point presentation with Dr. Bliss titled "Documentation and Coding Aortic Atherosclerosis Clarification," which they presented during a January 2013 WebEx conference call for NCAL Regional hospital coding staff and Clinical Documentation Integrity Staff (CDI).  *See* Exhibit 8. The presentation identified AA as an "Area of significant missed opportunity."[1]  *Id.* at REL0000069.  The presentation adopted TPMG's and Dr. Bliss' position that AA is a "systemic disease" that should always be diagnosed, documented, and coded when identified in a radiology report, and should be added to Kaiser's "Always Code" List (which is a Kaiser National Compliance Office document).

---

[1] Two years earlier, in a September 2011 power point presentation entitled "Documentation and Coding Leads Meeting," TPMG used the same phrase for capturing AA – "Area of significant missed opportunity" – establishing that capturing the diagnosis had been a long-term focus in the Kaiser NCAL region. *See* Exhibit 9 at REL0000107.

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

72.   Similar presentations were made throughout 2013, 2014 and 2015 to various Kaiser regional leadership audiences.   TPMG's AA directive and smartphrase were migrated to Kaiser's other regions and adopted by Kaiser's other Permanente Medical Groups.   For example, at Kaiser's Regional Reporting Group ("RRG") meetings, Kaiser regional leaders overseeing its Medicare Advantage programs presented on opportunities and techniques to capture high-yield HCCs, including AA, emulating NCAL TPMG.   *See* <u>Exhibit 10</u> at REL0000137. Similarly, Kaiser NCAL's Revenue Cycle Clinical Documentation Integrity/Improvement ("CDI") included vascular disease (including AA) as an HCC target, and an opportunity to query physicians based on radiology and imaging findings. *See* <u>Exhibit 11</u> at REL0000179-80.

73.   On behalf of NCAL HIM Regional Leadership, Ms. Bryant remained deeply concerned and continued to pursue direction and guidance from Janet Franklin of Kaiser's National Compliance Office, but received none.   Moreover, Ms. Bryant and NCAL HIM Regional Leadership, including Ms. Hernandez, continued to question the new direction taken by TPMG leadership regarding AA diagnosis and coding.   Due to her continued concern, Ms. Bryant went so far as to submit a question to AHA Coding Clinic, the recognized authority on ICD-9 and ICD-10 coding, on the issue in December 2012. *See* <u>Exhibit 12</u>.

74.   Kaiser drafted queries to Coding Clinic at least two other times regarding the proper coding of AA (*see* <u>Exhibit 13</u>):   In May 2013, Kaiser queried Coding Clinic regarding the status of AA as "a chronic systemic condition." *Id.* at REL0000189.   In its May 16, 2013 response, Coding Clinic stated that if the impact of AA were unclear, the physician should be queried. *Id.*   Over a year later, in approximately November 2014, Kaiser NCO's Janet D. Franklin, with the assistance of Ms. Bryant, drafted a detailed follow-up question to AHA Coding Clinic: Would AA "be considered a systemic condition that can be coded even in the absence of active intervention in the same way that other systemic diagnoses noted in Coding Clinic (*e.g.* COPD, CHF, Diabetes, Parkinson's Disease, hypertension) may be coded without additional documentation of evaluation, treatment, consideration, etc."? *Id.* at REL0000186-87.   Ms. Franklin noted in the attached exhibit that her draft was subject to review by Dr. Simon Cohn, Kaiser's physician lead for The Medical Group Federation and RRG, and other Kaiser staff.   Ms.

Bryant was later told by Nancy Anderson of Kaiser's NCO group that the question was never submitted to AHA Coding Clinic based upon a decision by Kaiser leadership, yet another Kaiser decision that caused Ms. Bryant and Ms. Hernandez significant concern.

75.    In the meantime, while the Permanente Medical Groups in Kaiser's other regions were following TPMG's practice to always document and code AA, Kaiser's National Compliance Office was taking its time deciding whether that direction was proper.  On July 23, 2014, TPMG approached Ms. Bryant and Ms. Hernandez to meet to discuss viewpoints regarding AA capture for Kaiser's National Compliance office.  *See* Exhibit 14 (calling the long-delayed meeting "a high priority and time critical").

76.    On July 31, 2014, a presentation was given to Kaiser's Coding Governance Group (CGG), which represents all Kaiser Regions, on the topic of AA capture for coding, taking the position that AA should be added to Kaiser's "Always Code List" as a chronic, systemic condition. *See* Exhibit 15 at REL0000220.

77.    In 2015, Dr. Simon Cohn, the physician lead for Kaiser's Medical Group Foundation and RRG, requested that Ms. Bryant meet with him face-to-face, but did not provide the topic of the discussion in advance.  During the meeting in Dr. Cohn's office, Dr. Cohn asked Ms. Bryant to summarize the events surrounding AA HCC capture at Kaiser, including the TPMG guidance and direction of Dr. Bliss and others, which she did. Dr. Cohn told Ms. Bryant that this issue was being further reviewed by the medical groups. Ms. Bryant told Dr. Cohn that it was not her place to question the clinical and medical interpretations of Dr. Bliss, so she accepted his direction but felt compelled to go to NCO for further and final advice. In the meantime, the improper coding of AA continued throughout Kaiser.

78.    *Finally*, on August 4, 2015, Kaiser's National Compliance Office and Medical Group Federation completed its "clinical review" of TPMG's AA directive, requiring that it be changed back to the way that Ms. Bryant, Ms. Hernandez and their colleagues in NCAL HIM stated it in 2011 and early 2012: "After having gone through clinical review, AA is not considered a systemic condition and will not appear on the final list of examples of systemic conditions.  The clinician must do more than just list this condition.  There must be documentation to show how it

impacted the current encounter. It will be up to the region to decide if they want to query the provider about this condition when it is only listed. Without a query and additional documentation from the provider to show how it impacted the encounter, it cannot be coded." *See* Exhibit 16 at REL0000224. This information from NCO was shared with Kaiser Coding Leaders as well so that they would be informed and comply with the directive.

### (iv)    *Impact of Kaiser's HCC AA "missed opportunity" directive*

79.    Kaiser's internal data establishes that its efforts to mine for AA succeeded in capturing and submitting an enormous increase of AA codes to Medicare and other payers, beginning with fewer than 600,000 AA codes captured and submitted in 2010 and culminating in over three million submitted in 2015. AA Dx ("Diagnosis") Frequency Report 2010-2016 (Source: Kaiser internal data aggregated by Ms. Bryant) *see* Exhibit 17 at REL0000226. Medicare claims for HCC 108 (Vascular Disease), the classification that includes AA diagnoses, were among the highest in number and revenue for Kaiser during 2014-2016. *See* Exhibit 18 at REL0000254. (Over 350,000 HCC 108 cases in 2014 submitted for almost $800 million in revenue).

80.    In early 2016, Ms. Bryant discovered in the course of ICD-10-CM/PCS national coding quality monitoring and coding validation that Kaiser was still coding AA based upon it being a systemic condition, notwithstanding the August 2015 conclusion of Kaiser NCO rejecting AA as a "chronic, systemic condition." Ms. Bryant, who was at that time working in Kaiser's National Revenue Cycle group, shared this finding with Ms. Hernandez, who was also working for this group at the time. Both Ms. Bryant and Ms. Hernandez were disturbed and troubled. Ms. Bryant brought the AA findings to the attention of Janet D. Franklin and Nancy Anderson of Kaiser NCO. Ms. Bryant requested that the appropriate coding guidance be posted in the National Coding Bulletin Board for all Kaiser Regions to see. She also provided the appropriate coding advice on AA to regional HIM leaders during leadership forum meetings and requested that each region disseminate the guidance to all appropriate staff and stakeholders, including Kaiser's medical groups.

81.    In 2016, after Kaiser had started to pull back the directive, there were still almost two million AA codes submitted across payers. Exhibit 17.  In just the first four months of 2016, Kaiser reported to Medicare Advantage over 300,000 cases of vascular disease (HCC 108), which includes the AA diagnosis codes, accounting for almost $700 million. Exhibit 18.  Many Kaiser members now have the diagnosis of AA assigned to their clinical profiles incorrectly, potentially impacting patients' future insurance coverage and profile.

82.    Ms. Bryant's and Ms. Hernandez believe and therefore allege that Kaiser has never gone back to validate the accuracy of AA documentation and coding for years prior to 2016, and has never repaid, restated, or otherwise reimbursed amounts falsely obtained during this period from over-diagnosing and over-coding AA.  Moreover, they believe and therefore allege that there has been no specific AA validation of documentation and coding or discussion regarding rebilling or resubmission of corrected claims or data.  Indeed, shortly before her retirement from Kaiser in October 2017, Ms. Bryant was asked by NCO's Nancy Andersen to join a coding workgroup to look at AA, as the Kaiser Medical Groups wanted to revisit the issue, *yet again*, of whether the condition is "systemic."   Thus, Kaiser continues its efforts to avoid "missed opportunities" with this false documentation and coding.

**B.**    ***Mechanical Ventilation Dependence Status ("Vent Dependence")***

**(i)**    ***Clinical significance, documentation and coding convention***

83.    The HCC for "dependence on respirator status" is HCC 82 (linked with ICD-9-CM code V46.11 (Dependence on respirator, status) and ICD-10-CM code Z99.11 (Dependence on respiratory ventilator status)).  Dependence on respirator (or ventilator) status is a "status code" that is used when a patient requires long-term, continued ventilator support to breathe beyond the acute care phase.  The status code is/was reported for both for Medicare Advantage HCCs and HHS HCCs (*e.g.*, Medicaid under the Affordable Care Act).  In 2016, Kaiser received approximately $11,497 for each HCC 82.

84.    On February 7, 2014, Coding Clinic stated in a specific response to Kaiser's inquiry – an inquiry initiated by Ms. Bryant with Ms. Hernandez's input – that "this code should

be reported when the patient requires continued ventilator support for an unexpected period of time and not for the short-term acute phase of a condition." Coding Clinic further stated that "there is no time frame set on what constitutes ventilator dependency." *See* Exhibit 19.

85.   In short, the HCC for vent dependence status should <u>never</u> be coded if a patient is weaned from a ventilator during or at the end of an acute short-term stay in the hospital (of whatever length) and discharged home or to a post-acute-care facility without vent support. That does not constitute "vent dependence status." Rather, a patient is vent dependent only if the patient relies on the ventilation to live on a long-term basis *and not for the short-term acute phase of a condition.*

### (ii)   *Kaiser's scheme*

86.   Kaiser's directives on vent dependence documentation and coding differ region by region, but are all invalid, with regions establishing a "time frame"-based criteria for documenting vent dependence status after which the specific code assignment is permitted. For example, TPMG, the medical group in Kaiser's NCAL region, defines the time period as 30 days or more on a ventilator before the status condition should be documented and then be coded irrespective of discharge status or disposition. Kaiser's Southern California PMG only requires 21 days as its time-frame criteria for documenting and coding this status.

87.   These directives contravene AHA Coding Clinic's caution that there is no "set time frame" and that vent dependence should not be reported for the short-term acute phase of a condition. Kaiser, especially its Permanente Medical Groups, consciously ignores Coding Clinic's response, instead criticizing and rejecting Ms. Bryant's professional coding decision to seek input from Coding Clinic in the first place, which led to Ms. Bryant being excluded from further coding discussions on this topic and others. By elevating set time periods over actual long-term dependence, Kaiser manipulates the system to over-code for vent dependence status. <u>Any</u> patient that is on a ventilator for a set period of time is assigned the status code by Kaiser, even if the patient's reliance is neither long-term nor continuous but instead arises from the acute phase of a condition or following a procedure.

88.     Moreover, Kaiser is ignoring its own improper directives by coding for vent dependence status even when patients are on vents for just a few days, then discharged without the vent.  Kaiser data shows high volumes of patients being coded for vent dependence status even after being discharged from the acute care hospital without a ventilator, and even for lengths of stay as short as one or two days across four hospital regions.

### (iii)   *Chronology and evidence*

#### (A)     **October/November 2013**

89.     Ms. Hernandez and Ms. Bryant were first made aware of Kaiser's vent dependence status documentation and coding practices in the context of newborns that are placed on ventilators temporarily in the hospital before being discharged home.  This came about due to the patient population impacting the Affordable Care Act, and questions were raised internally by Regional NCAL HIM leadership (Ms. Bryant, Ms. Hernandez and Dawna Toews) about whether V46.11 (vent dependence status) was appropriate in this circumstance.  Ms. Bryant, Ms. Hernandez and Ms. Toews were extremely concerned with the direction that TPMG wanted to take with the V46.11 status code.  The three of them discussed the situation and agreed that the status code should be infrequently assigned and coded; given the high number of such codes at Kaiser, it thus appeared that TPMG was focusing on capturing this status code inappropriately.

90.     In a series of meetings and emails, chronicled contemporaneously by Ms. Hernandez (*see* Exhibit 20), Ms. Hernandez and Ms. Bryant investigated Kaiser's existing coding practices, researched the proper coding convention, reached out to external clinical and coding experts and, on November 21, 2013, submitted an email query to AHA's Nelly Leon-Chisen, Director and Editor of Coding Clinic, and Sue Bowman, American Health Information Management Association ("AHIMA") Senior Director of Coding Policy and Compliance. ("AHIMA," like AHA's Coding Clinic, is a neutral organization that can be queried for guidance by coding professionals.)

91.     On November 22, 2013, AHIMA's Ms. Bowman responded by email as follows:  "V46.11 is intended for 'dependence' on a ventilator – meaning long-term dependence

29

1  (such as patients with spinal cord injuries or progressive neuromuscular diseases such as multiple

2  sclerosis) – not for short-term use of a ventilator during an acute illness, following surgery, etc.

3  So it seems unlikely that a newborn would be declared ventilator-dependent". *Id.* at REL0000262.

4        92.    On November 25, 2013, Kaiser's NCAL HIM's Regional Coding Review

5  Managers met onsite. All agreed that the vent dependence status code would not be appropriate

6  for newborn initial clinic visits, follow-up clinic visits, or hospital short-term acute care visits, nor

7  if the newborn was weaned and discharged home without ventilation. They concluded and

8  insisted that Kaiser's hospital coding staff should follow and be compliant with official coding

9  guidelines.

10        (B)    **December 2013**

11

12        93.    During a follow-up phone conference on December 3, 2013 attended by Ms.

Hernandez and members of TPMG's Encounter Information Operations group ("EIO," a TPMG

13  group that specifically focuses on the Medicare Advantage program and was led at the time by

14  Director Anne Cadwell), the above coding guidance conclusion was rejected over Ms.

15  Hernandez's objection and notwithstanding the references provided, including that Ms. Bryant had

16  submitted an inquiry to AHA Coding Clinic. TPMG stated that it would move forward with

17  capturing vent dependence status if a newborn was placed on ventilation for at least 12 continuous

18  hours, even if the baby was successfully weaned and discharged.

19        94.    The December 3 directive was followed by a call to Ms. Hernandez on

20  December 4, 2013 from TPMG Director Ms. Cadwell and Dr. Bliss, who focused not on Kaiser's

21  invalid coding of vent dependence or references provided, but on why Coding Clinic was queried

22  by Ms. Bryant in the first place. Ms. Hernandez was required to provide Ms. Bryant's cell phone

23  number so that the TPMG EIO Directors could immediately contact Ms. Bryant once they learned

24  that she was the one who submitted the Coding Clinic query. Dr. Bliss and Ms. Cadwell called

25  Ms. Bryant to rebuke and chastise her for submitting a query to Coding Clinic without notifying

26  TPMG. Both Ms. Hernandez and Ms. Bryant were in Dr. Bliss' "line of fire," and were very

27  distressed. *See* Exhibit 21.

28

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

95.    Ms. Hernandez and Ms. Bryant were told not to inquire outside Kaiser anymore on such issues without input and approval from Kaiser's Coding Governance Group (CGG). They were warned that outside inquiry would create risk for Kaiser. Once again, pressure and criticism were directed at Ms. Bryant and Ms. Hernandez for not agreeing to TPMG's approach to capturing this diagnosis.

96.    On December 8, 2013, Ms. Hernandez was further instructed by TPMG Clinical Documentation Improvement ("CDI") Physician Director Dr. Shirley Cachola, to "use 'respirator dependence' for patients with tracheal intubation until the specifics are clarified by the coding clinic .... Not sure this meets compliance since it is not defined but this is how med. group wishes to proceed for now." Exhibit 22 at REL0000273. Ms. Bryant and Ms. Hernandez believed this instruction to be clear error and unethical, a sentiment echoed by their colleague in the Regional HIM group, Dawna Toews, who questioned how the company could proceed "when it is clearly out of compliance.... I am not inclined to continue working for a company that blatantly ignores guidelines I have promised to follow, and that put me in jeopardy of losing my professional licensing." Id. at REL0000269.

97.    Ms. Bryant was directed by TPMG to quickly follow-up on the pending response from Coding Clinic on the newborn-specific issue of vent dependence coding. On December 6, 2013, Coding Clinic's Senior Coding Consultant Anita Rapier wrote via email to Ms. Bryant that "code V46.11 (respirator dependence status) is used to describe patients who have been dependent on mechanical ventilation over a period of time. It is not used for newborns who are placed on a vent for a short period." Exhibit 20 at REL0000267.

98.    Ms. Bryant sent a follow-up email to Anita Rapier as follows: "Thus if a newborn was placed on a vent for 12 or even 20 hours and then at discharge is NO longer on the vent, we would not assign the V46.11 status code to that discharge/stay." AHA Coding Clinic's Senior Coding Consultant Ms. Rapier responded immediately: "Yes, that is my interpretation." Id. at REL0000266. Thus, Coding Clinic corroborated AHIMA's response and Ms. Bryant's and Ms. Hernandez's original conclusion. Coding Clinic's more formal February 7, 2014 response letter to Ms. Bryant, quoted above, confirmed its guidance. See Exhibit 19.

31

99.     Contemporaneously, Ms. Bryant and Ms. Hernandez continued to have deep concern and investigated Kaiser's coding practices for vent dependence status both inside and outside of the newborn care context, including for patients in the Medicare Advantage program. They quickly confirmed that they were similar.  TPMG in Kaiser's NCAL region required its CDI Physician Director Dr. Cachola, CDI Managers, Susan Ingerbretsen and Donna McIvor (under Dr. Bliss' leadership) to create an acceptable timeline for the capture of vent status code.   In Diagnostic Guidelines published in November 2013, TPMG CDI established a "greater than 30 day" rule for vent dependence status:  that is, if a patient is receiving respiratory support through a tube for more than 30 days, then vent dependence status code is to be assigned, even if the patient is successfully weaned and discharged without a ventilator.  Exhibit 23 (TPMG Neonatal Intensive Care Unit Diagnostic Guidelines), at REL0001005.

100.     Similarly, in Kaiser's SCAL region, SCPMG's regional CDI program established a 21-day duration of care to constitute vent dependence.  Exhibit 24 (HIX Neonatology Documentation and Coding 2014), at REL0001040.

101.     The RRG meetings that Ms. Bryant attended often included the capture of specific HCCs, and ventilation status was included on numerous occasions.  In this way, Kaiser's improper practice for coding the ventilation status code was migrated throughout the Kaiser regions and adopted by all of Kaiser's Permanente Medical Groups, notwithstanding the coding guidance from Coding Clinic and AHIMA.

(iv)     *Impact of Kaiser's vent dependence practices*

102.     Kaiser data compiled by Ms. Bryant through her national coding quality monitoring work establishes that the Vent Dependence status code is being captured frequently by Kaiser.  Medicare Advantage and HHS-HCC payer data specifically indicated a high volume of these codes, particularly in Kaiser's NCAL and SCAL regions. *See* Exhibit 25 and Exhibit 18.

103.     The coding data includes a high volume of cases in which patients are successfully weaned from ventilation and routinely discharged home or to self-care, including after just a day or two in the hospital.  *See id.*; Exhibit 26 (showing NCAL vent dependence

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

cases).  In a December 2013 validation audit, Ms. Hernandez and her NCAL audit team concluded that 100% of a sample of TPMG vent dependence cases were invalid.  See Exhibit 27.

104.    Data from all Kaiser Regions confirms that the vent dependence coding volume has skyrocketed across Kaiser. See Exhibit 28 (Kaiser data gathered by Ms. Bryant). See also Exhibit 18 (includes vent dependence (HCC 82) data submitted by Kaiser to the Medicare Advantage program from January, 2014 through April, 2016).

105.    Kaiser cannot articulate or produce any clinical research, standards or evidence-based medical justification for coding vent dependence status once a patient has been ventilated and removed after a set number of days; for coding vent dependence status even when ventilation is used for far fewer days than the purported thresholds; or for setting different policies for determining ventilation dependence status within the various Kaiser regions.

106.    Ms. Bryant and Ms. Hernandez further believe and therefore allege that Kaiser's proprietary, diagnoses electronic "pick list" is being utilized by Kaiser to easily and falsely capture this inaccurate status code in all clinical settings.  Moreover, they believe and therefore allege that Kaiser has never gone back to validate the coding to identify incorrect codes, and has never repaid, restated, or otherwise reimbursed amounts falsely obtained during this period from over-diagnosing and over-coding vent dependence status.  To their knowledge, there has been no validation or discussion for rebilling or resubmission of corrected claims or data.

## C.    *Sepsis (and related conditions)*

### (i)    *Clinical significance and coding convention*

107.    Sepsis (and Septicemia, SIRS, etc.) (HCC 2) refers to a systemic inflammatory response due to an infection. It is coded under ICD-9-CM codes 038.0–038.9 (Sepsis/Septicemia) and 995.91-95 (SIRS with/without organ dysfunction), and under ICD-10-CM codes A41.0–A41.19 (Sepsis/Septicemia) and R65.10-.11 (SIRS of non-infectious origin with/without acute organ dysfunction) and R65.20-21 (SIRS with/without septic shock).  It is a serious condition that can be fatal if not promptly identified and treated.  Severe sepsis is sepsis

with associated acute organ dysfunction. In 2016, Kaiser received approximately $4,047 for each HCC 2.

108.   "Lactic Acidosis" is a buildup of lactic acid levels in the blood stream that is often but not always caused by organ failure and can be a sign of impending sepsis. It is coded under ICD-9-CM code 276.2 (Acidosis) and ICD-10-CM code E87.2 (Acidosis).  Coding Clinic has issued guidelines that state that coding professionals cannot use lactic acidosis alone as the basis for severe sepsis without physician documentation of the specific type of organ failure (*i.e.*, respiratory failure, renal failure, etc.).

109.   Given the seriousness of severe sepsis, it should be extremely uncommon for a patient with this condition to be released from the hospital within three or fewer days of being diagnosed. The Medicare Severity Diagnosis Related Group (MS-DRG) length of stay for Fiscal Year 2017 for the three sepsis MS-DRGs are:  DRG 870, with geometric length of stay of 12.6 days, MS-DRG 871, with geometric length of stay of 4.9 days and MS-DRG 872, with geometric length of stay of 3.8 days.

(ii)   ***Kaiser's scheme***

110.   Motivated initially by *bona fide* quality concerns (there appeared to be under-reporting of sepsis in Kaiser's NCAL KFH region, impacting patient outcomes and mortality scores), Kaiser initiated programs to educate physicians and coding staff to better capture sepsis diagnoses in documentation and coding.  Efforts to identify "early sepsis" were undertaken by Kaiser's Quality group and other clinical areas.

111.   Kaiser's *revenue* goals, however, quickly subsumed the quality effort, leading to a significant trend of *over*-diagnosing, documenting, and coding sepsis in the hospital inpatient setting, at least in Kaiser's NCAL KFH region under the influence of TPMG.  The focus, again, was on HCC capture.  The over-coding came in two forms.  First, TPMG physicians and leadership, NCAL KFH CDI staff, and NCAL KFH coding staff, under the direction and guidance of TPMG's Dr. David Bliss, diagnosed, documented, and coded severe sepsis and organ dysfunction whenever lactic acidosis was present.  As noted above, lactic acidosis can be an

34

indicator for severe sepsis, but should not be diagnosed or coded absent specific organ dysfunction/failure. Dr. Bliss had many MA-HCC focus areas for capturing additional revenue, which included the severe sepsis HCC and the Medicare Advantage HCC for organ failure.

112.   Second, sepsis was frequently diagnosed, documented, and coded even when patients were discharged within a few days of being diagnosed, including many that were discharged home. This is a red flag for accuracy that was never adequately explained or followed-up on.

113.   Kaiser's NCAL region continued these documentation and over-coding practices for lactic acidosis as organ dysfunction and the inappropriate capture of sepsis and severe sepsis for a period of time even after Ms. Bryant raised her concerns. Kaiser never reviewed, corrected the false sepsis, severe sepsis, and organ dysfunction codes, nor was there any repayment of money received under false pretenses as far as Ms. Bryant and Ms. Hernandez are aware.

(iii)   *Chronology and evidence*

114.   In approximately mid-2010, Kaiser's NCAL Regional Quality group (led by Dr. Alan Whippy) grew concerned with lower-than-expected reporting of inpatient sepsis cases within the regional medical centers, and the higher-than-expected hospital mortality rate among patients without a diagnosis of sepsis. Dr. Whippy and her Director, Barbara Crawford, RN, reached out to Ms. Bryant to determine if there were coding issues in this inpatient diagnostic population group.

115.   Beginning with the Vallejo Medical Center in August 2010, Kaiser's NCAL Regional HIM group, led by Ms. Bryant, conducted hospital inpatient audits to determine if sepsis was being under-reported through validation of documentation and coding. *See* Exhibit 29.

116.   By March 2011, Kaiser NCAL KFH and TPMG had developed and begun conducting presentations to educate physicians and hospital coding staff on proper documentation, optimal coding and reporting of sepsis. Ms. Bryant participated in developing these programs and collaborated on a Kaiser National level to present to coding staff across Kaiser. These

presentations <u>correctly</u> presented the issues and the coding guidelines and conventions. *See* <u>Exhibit 30</u>.

117.    <u>Lactic acidosis issue</u>.    At around the same time in 2011, however, Kaiser TPMG's Dr. Bliss, with the support of TPMG's Encounter Information Operations (EIO) under the direction and leadership of Anne Cadwell and Karen Graham, began instructing physicians that lactic acidosis is more than an indicator of severe sepsis, but is the *equivalent* of severe sepsis such that the presence of lactic acidosis should <u>always</u> lead to a severe sepsis diagnosis and should be coded by the hospital coding staff.

118.    In addition, TPMG provided guidance to NCAL CDI to capture lactic acidosis and organ dysfunction. NCAL Regional HIM, led by Ms. Bryant, informed NCAL CDI that they were not comfortable with this guidance.  Ms. Bryant again took the lead and wrote AHA Coding Clinic on January 24, 2011. *See* <u>Exhibit 31</u>.

119.    On January 30, 2012, Coding Clinic responded to Ms. Bryant:  "It would not be appropriate to assign code 995.62, Severe Sepsis for a patient diagnosed with sepsis and 'Lactic Acidosis'. The providers documentation must indicate the specific type of organ dysfunction (*i.e.*, kidney, heart, liver, etc.) in order to assign code 995.92."    Coding Clinic's response is dated April 15, 2011, but Ms. Bryant did not receive it until January 30, 2012, as reflected in the attached emails. *See* <u>Exhibit 32</u>; <u>Exhibit 33</u>, Coding Clinic's response supported the opinion of Ms. Bryant and Ms. Hernandez.

120.    Ms. Bryant immediately notified Janet Franklin of Kaiser's National Compliance Office by email of Coding Clinic's decision, noting that she was "concerned with past practices and capturing HCCs and MCCs." *See* <u>Exhibit 32</u>.  The next day, on January 31, 2012, Ms. Bryant forwarded Coding Clinic's guidance to Dr. Bliss, Ms. Anne Cadwell and other senior personnel at TPMG so they would take the appropriate action to implement the guidance. *See* <u>Exhibit 34</u>.  On February 13, 2012, Ms. Bryant and her team drafted and circulated a memo to all Kaiser NCAL HIM Directors and Coding Staff quoting and implementing the correct Coding Clinic guidance. *See* <u>Exhibit 35</u>.

121.   Notwithstanding Coding Clinic's straightforward, unambiguous guidance, and Kaiser's own policy adopting it, Dr. Bliss and TPMG under the direction of Ms. Cadwell and Ms. Graham did not immediately act on it.  There was confusion with hospital coding staff due to TPMG's and Dr. Bliss' continuing interpretation, ongoing physician education, and the existing physician documentation equating lactic acidosis with organ failure for severe sepsis.  Ms. Bryant and Ms. Hernandez were alarmed to see medical records and coding audits indicating that Kaiser's physicians were diagnosing and documenting sepsis, severe sepsis, and lactic acidosis as organ dysfunction at a high frequency, which resulted in the improper coding of sepsis.  The guidance was slowly accepted and instituted for NCAL hospital coding, but not until many more codes (ICD-9-CM) were improperly submitted.

122.   Ms. Bryant and Ms. Hernandez believe and therefore allege that Kaiser never corrected the improperly-submitted sepsis and lactic acidosis codes, or otherwise notified payers, including the MA program, of what it had done.

123.   <u>Short-stay sepsis issue</u>.  Over time, Ms. Bryant and Ms. Hernandez also became concerned with a disturbing trend in the NCAL region for hospital inpatient records: Sepsis was being regularly diagnosed, documented, and coded even when patients were discharged from the hospital within a few days of the diagnosis being made.  They believed that most if not all such short-length-of-stay cases were likely misdiagnosed, misdocumented, and miscoded because sepsis is too serious of a condition to lead to such a quick recovery and discharge.  They also observed that sepsis had been diagnosed, documented, and coded in outpatient settings on several occasions, where patients were merely being "observed" by Kaiser Hospital medical staff.  They believed that sepsis could not be properly diagnosed, documented or coded at all under these circumstances.

124.   Ms. Bryant and those assisting her with the audit and review of the issue concluded that one contributing cause of the over-diagnosing (and over-coding) in these short-stay situations was the query form used by Kaiser's NCAL CDI department (under TPMG EIO's leadership and guidance).  The query tip form was leading in that it improperly suggested that the physician select "sepsis" based on 2 out of 6 clinical criteria being met (*i.e.*, temperature >100.1,

1  heart rate >20, etc.) when the proper diagnosis was likely a separate infectious process or some

2  other less serious condition. *See* Exhibit 36 (CDI Query "Tip Sheet") at REL0000412. *See also*

3  Exhibit 37 (emails from April 2013 discussing one short-stay case).

4       125.    This concern was shared by Ms. Bryant and Ms. Hernandez with the NCAL

5  Revenue Cycle Director of Risk Management, Sue Muscarella, RN. Ms. Muscarella reviewed the

6  material and audit findings provided to her by Ms. Bryant and Ms. Hernandez (see Exhibit 38),

7  and agreed that there was cause for concern, especially in the 1-2 day lengths of stay and

8  observation, and that there should be a discussion with Dr. Whippy and Dr. Bliss. Ms. Bryant and

9  Ms. Hernandez recall such a meeting being planned but do not believe that it ever occurred; they

10 never received any information from Ms. Muscarella or otherwise that action had been taken to

11 address the issue.

12       126.    By the end of 2013, Ms. Bryant had left Kaiser's NCAL region to take a

13 position with Kaiser National Revenue Cycle located in a different building in the downtown

14 Oakland area as National Director of Coding Quality, Education, Systems and Support. She was

15 not privy to TPMG's follow-up regarding the short-stay sepsis issue after that date, although in her

16 national role she continued to see data indicating that the issue had not changed and had never

17 been corrected. Ms. Hernandez, in her NCAL Regional HIM role, continued to see the issue come

18 up in audits conducted by her and her staff of Regional Coding Review Managers throughout

19 2013.

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

### (iv)   *Impact of Kaiser's Sepsis Over-Coding*

127.   Sepsis diagnosis/HCC has been identified as a top-two most frequently reported ICD-9-CM/ICD-10-CM code in the hospital setting in four Kaiser hospital regions from 2011-2016 (Hawaii, Northwest, Northern California and Southern California Regions). Accordingly, the revenue impact of over-coding of this condition was substantial, especially for Medicare Advantage, HHS/HCC, Medicare Part A and other payers.  *See* Exhibit 18 (includes sepsis (HCC 2) data submitted by Kaiser to the Medicare Advantage program from January, 2014 through April, 2016).

128.   Ms. Bryant and Ms. Hernandez believe and therefore allege that Kaiser has never repaid, restated, or otherwise reimbursed amounts falsely obtained during this period from over-diagnosing and over-coding sepsis, severe sepsis and organ dysfunction.  Moreover, they believe and therefore allege that there has been no documentation and coding validation or discussion regarding rebilling or resubmission of corrected claims or data.

### D.   *Morbid obesity.*

129.   AHA Coding Clinic guidance states that ICD-9 Code V85.4, Body Mass Index ("BMI") 40 and over for adults generally corresponds to extremely obese.  This is well recognized as a health risk and can impact Medicare reimbursement.

130.   In early 2013, Dr. Bliss, Senior Medicare Coding Leader (CDI Physician Liaison) for Kaiser's NCAL TPMG region was focusing on the capture of HCC 22 for morbid obesity. Contradicting Coding Clinic, Dr. Bliss and other TPMG leadership instructed physicians to diagnose morbid obesity when BMI is between 35 and 39.9 and "another condition" is also present. He instructed the physicians to utilize the Kaiser Health Connect (EHR) diagnosis "pick list" to select morbid obesity or severe obesity in such circumstances, leading to over-coding of the morbid obesity diagnosis.  Other diagnosis categories at issue include ICD-9-CM codes 278.01 (Morbid Obesity), V84.35-.39 (BMI 35.0-39.9, Adult) and ICD-10-CM codes E66.01 (Morbid Obesity) and Z68.35-.39 (BMI 35.0-39.9, Adult).  Morbid obesity is associated with HCC 22 and

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

1  is a listed "Risk-Adjustment Opportunity" by TPMG. In 2016, Kaiser received approximately

2  $2,761 for each HCC 22.

3      131.   In June 2013, Ms. Hernandez recognized the discrepancy between Dr. Bliss'

4  instructions and Coding Clinic's standard and instructed and required hospital coding staff under

5  her oversight to query physicians every time there was a morbid obesity diagnosis with a BMI of

6  30-39.0 to confirm its compliance and accuracy.

7      132.   To gain further insight, Ms. Hernandez notified Ms. Bryant, who agreed

8  with the concern and submitted a question to AHA Coding Clinic on July 8, 2013 inquiring about

9  the different standards of BMI range and co-morbidities with morbid obesity.   Coding Clinic

10 responded on September 20, 2013 (*see* Exhibit 39 at REL0000420) that the "coder cannot make

11 the assumption based on documentation of BMI or co-morbidities alone that it is appropriate to

12 assign a code for morbid obesity."  The Centers for Disease Control ("CDC") has a healthcare

13 industry standard that defines obesity as follows as of August 5, 2017:  "Class 3: BMI of 40 or

14 higher. Class 3 obesity is sometimes categorized as 'extreme' or 'severe' obesity." *See* Exhibit 40.

15     133.   Ms. Bryant and Ms. Hernandez believe and therefore allege that TPMG has

16 never altered the approach mandated by Dr. Bliss, but contradicted by Coding Clinic and the

17 CDC, regarding the diagnosis and coding of morbid obesity, or corrected codes or ever repaid,

18 restated, or otherwise reimbursed amounts falsely obtained during this period from over-

19 diagnosing and over-coding morbid obesity.

20     134.   Ms. Bryant was also made aware of another morbid obesity documentation

21 and coding issue in October 2013 while attending a Regional Reporting Group (RRG) meeting.

22 The Colorado PMG physician lead, Dr. Teresa Welsh, gave a "best practice" presentation on

23 physician querying for morbid obesity. Exhibit 41 at REL0000456-464.  Ms. Bryant felt that the

24 suggested best practice was leading, a concern which she addressed immediately with Nancy

25 Andersen of Kaiser's NCO, who was also present at the RRG meeting.  Ms. Andersen agreed with

26 Ms. Bryant that the practice and examples shared in the presentation were improperly leading, but

27 nothing was said during the RRG meeting to correct the presentation.  Instead, Ms. Andersen sent

28 a follow-up email to Dr. Welsh regarding the leading query practice presented at the RRG, blind

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

1  copying Ms. Bryant, with advice and guidance on the compliant way to query. There was no

2  mention of correcting past actions, correcting the medical record, or going back and

3  rebilling/resubmitted corrected claims. *See* Exhibit 42.

4      135.   Kaiser data establishes that morbid obesity continued to have a high

5  frequency of being coded in Kaiser's MA population. *See* Exhibit 18 (2014-2016 data regarding

6  Kaiser's Medicare Advantage Program; morbid obesity data found at HCC 22).

7  **E.    *Malnutrition***

8      136.   Ms. Bryant and Ms. Hernandez also believe and therefore allege that Kaiser

9  is systematically over-documenting and coding protein-calorie malnutrition (ICD-9-CM codes

10  260-263.9 and ICD-10-CM codes E43 – E46), which also falls within an HCC category (HCC 21).

11  There are specific codes to identify mild, moderate and severe Protein Calorie Malnutrition

12  ("PCM"). In 2016, Kaiser received approximately $5,393 for each HCC 21

13      137.   Kaiser's CDI querying activities improperly lead physicians to diagnose

14  protein-calorie malnutrition, including the use of "SMARTPHRASE" acknowledgments of

15  dietician diagnoses of PCM with a co-signature of dietary notes. TPMG CDI targeted protein-

16  calorie malnutrition HCC 21 as one of the top risk-adjustment opportunities. Ms. Hernandez

17  witnessed several instances of this in October and November 2012, which she discussed with Ms.

18  Bryant, Kaiser's Coding Review Manager, and Kaiser's NCO coding group, including Janet D.

19  Franklin and Nancy Andersen. There was general agreement among this group that leading

20  queries are not appropriate, and that the co-signature of a physician on dietary notes is not

21  sufficient documentation for a PCM diagnosis. Ms. Hernandez also addressed the issue with

22  TPMG CDI's Quality Assurance manager in the hope that it would be communicated to the CDI

23  management team. Nevertheless, to Ms. Hernandez's knowledge, the leading queries were not

24  discontinued nor were the documentation requirements changed.

25      138.   Ms. Bryant is aware of another concern regarding protein-calorie

26  malnutrition documentation and coding in Kaiser's Northwest Region. The Northwest PMG's

27  HIM Coding Manager, Sharon Beausoleil, emailed Ms. Bryant in late 2014 regarding concerns

28

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

about documentation and coding of protein-calorie malnutrition on HHS-HCC's for newborns.  In particular, she was concerned with the query language being utilized by the CDI staff in the NW Region, which appeared to not be supported by clinical indicators and to be leading.

139.    Ms. Beausoleil provided Ms. Bryant a short list of inpatient medical record accounts which Ms. Bryant asked one of her staff, Ms. Sherry Davis, to review to validate the protein-calorie malnutrition documentation and coding.  Ms. Davis identified in her review that there was no supporting documentation or clinical indicators for a newborn malnutrition diagnosis for these records.  Ms. Bryant reviewed the findings with Ms. Davis and concurred. Ms. Bryant and Ms. Davis prepared a written summary of their findings which they shared with Ms. Beausoleil via webex in March 2015.  *See* Exhibit 43.

140.    Shortly thereafter, Ms. Beausoleil spoke with Ms. Bryant and cautioned her that Dr. Annette Guido, Northwest PMG's Medical Director, was questioning Ms. Bryant's authority to audit the region's medical records, notwithstanding Ms. Bryant's position with Kaiser's National Revenue Cycle group.  In addition, Ms. Beausoleil called after work hours and told Ms. Bryant that she (Ms. Beausoleil) was told "not to contact" her (Ms. Bryant) regarding documentation issues, and Ms. Beausoleil stated that Ms. Bryant should be very careful and "should watch her back."  Ms. Bryant was gravely concerned with these warnings and with the barrier placed on her pursuing the issue further.

141.    These issues continue at Kaiser to this day.  In late 2016, Kaiser's TPMG CDI Director Emily Emmons contacted Ms. Bryant about a possible compliance issue regarding PCM diagnosis, documentation, and coding.  *See* Exhibit 44.  Ms. Emmons was concerned with dietary documentation of PCM wherein physicians appeared to be queried in a leading manner. After discussing and reviewing the documentation examples, Ms. Bryant agreed that they appeared to be leading in order to obtain a diagnosis of severe or moderate malnutrition. Ms. Bryant requested that Ms. Emmons set up a conference call with the Regional Dietary Lead and Regional Compliance. There were several emails and conference calls held on the topic which included Dietary, Regional Compliance, Regional CDI and Ms. Bryant which continued into mid-2017.

142.    Moderate and Severe PCM in hospital inpatient records were a focus of Kaiser's dietary staff once the patient met some specific clinical criteria. The query language being used was directing the physicians to choose either moderate or severe PCM, the high-paying diagnoses, and no other. Ms. Bryant and Ms. Emmons advised that to be compliant, the query language should be revised to include other options such as mild, other, unspecified, clinically undetermined, etc.  It was agreed by Ms. Emmons, the Dietary Lead (Jan Villarente, Regional Director), Regional Compliance (Svitlana Ozhyndovsky) and Ms. Bryant that Kaiser's dietary leadership should make changes to the query language to address the compliance concerns. Ms. Bryant believes and therefore alleges, however, that use of the leading query language had been ongoing for a year or more before it was identified and changed, and has no knowledge of corrective actions taken by the NCAL Region on prior medical records..

143.    Kaiser data compiled by Ms. Bryant through her national coding quality monitoring work establishes that malnutrition continues to have a high frequency of being coded in Kaiser's MA population. Kaiser Medicare Advantage data regarding malnutrition (HCC 21) frequency from January, 2014 through April, 2016 can be found in Exhibit 18.  Ms. Bryant and Ms. Hernandez believe and therefore allege that Kaiser has never conducted a validation of the diagnosis of protein-calorie malnutrition, and has never repaid, restated, or otherwise reimbursed amounts falsely obtained during this period from over-diagnosing and over-coding protein-calorie malnutrition. Moreover, they believe and therefore allege that there has been no documentation and coding validation or discussion regarding rebilling or resubmission of corrected claims or data.

**F.    *Acute Renal Failure, Acute Kidney Injury and Respiratory Failure***

144.    Similarly, Ms. Bryant and Ms. Hernandez have witnessed what they believe and therefore allege is over-documentation and over-coding of the following HCC diagnoses prior to and after ICD-10 implementation: acute renal failure and acute kidney injury (ICD-9-CM 584.9 and ICD-10-CM N17.0-N17.9 code range, which correlate to HCC 135) and respiratory failure (ICD-9-CM 518.81-518.84 code range and ICD-10-CM J96.00-J96.92 code range, which correlate

43

to HCC 84).  In 2016, Kaiser received approximately $3,600 for each HCC 135 and $2,489 for each HCC 84.

145.    While in her Kaiser National Revenue Cycle role, Ms. Bryant ran frequency reports on various Kaiser regions on the diagnosis code range for respiratory failure (including MA HCCs), by payer, by region. and by setting from 2010-2016, which showed a significant increase from 2010 to 2016 with a spike in 2015. *See* Exhibit 45 (data gathered by Ms. Bryant for respiratory failure coding trend in Kaiser's NCAL and SCAL regions).  Kaiser data compiled by Ms. Bryant through her national coding quality monitoring work establishes that respiratory failure has a high frequency of being coded in Kaiser's MA population. *See* Exhibit 18 (Kaiser Medicare Advantage data regarding cardio-respiratory failure and shock (HCC 84) frequency from January, 2014 through April, 2016).

### G.    *Other Over-Coded and Up-Coded Diagnoses*

146.    **Arrhythmia for members with pacemakers.**   Near the end of her employment with Kaiser, Ms. Bryant was informed and believes, and therefore alleges, that at least Kaiser's NCAL and Colorado regions (TPMG and the Colorado PMG), and perhaps other Kaiser regions, are instructing doctors to diagnose and document so that Kaiser's coders would code heart arrhythmia for members even after the members receive pacemakers to correct their arrhythmia.  It would be atypical for a patient to have a pacemaker but to continue to suffer from arrhythmia, unless there is a rare pacemaker complication.  Yet Kaiser routinely and improperly reports both the pacemaker status code and the cardiac arrhythmia code (HCC 96), adding thousands of dollars to the risk profile of each such member.  In addition to cardiac arrhythmia, diagnoses for ventricular fibrillation and ventricular flutter (HCC 84) were also overdocumented. In 2016, Kaiser received approximately $2,231 for each HCC 96 and approximately $2,489 for HCC 84.

147.    Ms. Bryant was first made aware of the issue in 2014 with respect to Kaiser's Colorado PMG, but more recently (in the fall of 2017) was informed by Ms. Andersen of Kaiser NCO that it is also evident in Kaiser's NCAL region operated by TPMG.  Ms. Bryant

expressed her disagreement to physicians from the Washington and Northwest Medical Groups, who nevertheless insisted that the record should have both the pacemaker status and the arrhythmia code assigned.

148. **Major depression.** Ms. Bryant and Ms. Hernandez have also witnessed Kaiser and its various regional subsidiaries aggressively pursue the diagnosis and coding of major depression (HCC 58). *See, e.g.,* Exhibit 10 at REL0000139 (June 16, 2015 RRG WebEx presentation highlighting major depressive disorder capture). Kaiser's laser focus on this valuable code (worth approximately $2,482 per code in 2016) has led to over-coding and up-coding. In 2016, Kaiser received approximately $2,496 for each HCC 58. Moreover, Ms. Bryant is informed and believes that, in 2015, in at least Kaiser's SCAL region (SCPMG) and likely other Kaiser regions, Kaiser manipulated its electronic system for picking diagnoses to "gray out" the diagnosis of "major depression unspecified," which is not linked to an HCC, so that Kaiser doctors would not pick that diagnosis but would instead select a major depression diagnosis category that is linked to a high-paying HCC. Ms. Hernandez believes that this practice also took place in TPMG.

149. **Acute stroke.** In 2014, Ms. Bryant learned that in at least Kaiser's Colorado and Georgia regions (operated by the Colorado PMG and Mid-Atlantic PMG), Kaiser physicians and coders were assigning the "acute" stroke code for all first office visits after a stroke patient left the acute care hospital, rather than a lower-paying code for "sequela" or "late effect" stroke normally associated with post-hospital stroke recovery and follow-up. Ms. Bryant was informed and believes that the reason for this Kaiser practice of incorrectly selecting acute stroke was to maximize HCC monies. An ICD-9 and ICD-10 diagnosis code for acute stroke links to HCC 100. In 2016, Kaiser received approximately $2,398 for each HCC 100.

## II.   "THE KAISER WAY" IGNORES ESTABLISHED PROCEDURE, INCENTIVIZES GREED, AND CULTIVATES FRAUD

150. At every level and across regions, Kaiser is driven by a corporate culture that demands and rewards financial success from its employees. Kaiser's senior management pushes relentlessly to increase Kaiser's revenue from risk adjustment. The risk adjustment

practices described in this Complaint are attributable in large part to these demands and rewards. Ms. Bryant and Ms. Hernandez have witnessed Kaiser's profit-seeking and financial-gaming culture corrode its compliance function over many years, leading to the frauds described herein on the government and its Medicare and Medicaid programs.

## A.   *Kaiser's policies and procedures*

151.   Kaiser consistently publishes and enforces internal company policies and procedures that contravene coding and diagnostic principles that are widely accepted and enforced within the broader coding community.   To avoid detection, Kaiser sometimes labels its instructional documents as "Program Advisories" rather than "policies" in order to circumvent the implications of imposing an improper requirement.   But these Advisories are not optional and are enforced like any other policy and procedure within Kaiser.

152.   Many of Kaiser's proprietary policies regarding diagnosing and coding are intentionally constructed to be less restrictive than the norm in furtherance of the company's emphasis on profit over compliance.   These departures from accepted policy and procedure lead directly to improper documentation, coding and overbilling.   Kaiser's Permanente Medical Groups and Kaiser's Medicare Finance Department initiate and lead this corporate culture, focusing on capturing higher reimbursement without any contravening focus on the avoidance of overbilling.

153.   Kaiser's National Compliance Office is ineffective, apprehensive, and slow in investigating and responding to documentation and coding compliance issues.   In addition, NCO coding leadership has openly admitted to Ms. Hernandez that the Kaiser Permanente Medical Groups have significant control over chart audit selection, accuracy rates, documentation guidance, coding policy and practices, all to manipulate the capture of more HCC codes and to increase government payer reimbursement.   Instead of turning to NCO, the Permanente Medical Groups ask "Medical Group Regional Compliance" staff for advice which can be manipulated easily within the region to get the desired result (*e.g.*, more HCC target capture).   When NCO completes an internal audit that shows inaccurate or misleading documentation or coding, NCO is pressured and intimidated by the relevant Regional PMG to change the audit's accuracy results.

154.   On a system-wide basis, Kaiser has been reluctant to perform historical code correction and billing submission when a problem or issue has been identified that should be rebilled.   The culture at Kaiser perpetuates a superiority, manipulation, and intimidation by physician medical group leaders and medical group management, resulting in an inability to challenge or present a different perspective, even when backed by express, unambiguous coding guidelines, standards or HIM coding expertise, without being chastised, threatened and ridiculed.

#### (i)   *Query templates*

155.   Coding professionals are permitted under AHIMA's Standards of Ethical Coding to query physicians/providers for clarification and additional documentation prior to code assignment when there is conflicting, incomplete, or ambiguous information in the health record regarding a significant reportable condition or procedure or other reportable data element dependent on health record documentation.  Querying physicians/providers is also permitted after billing (*e.g.*, retrospectively) if performed in a timely manner.

156.   But these Standards, as well as AHIMA's Guidelines for Achieving a Compliant Query Practice and AHIMA's Managing an Effective Query Process Practice Brief, forbid coding professionals and others (e.g., clinical staff, physicians, nursing staff, etc.) who query from "leading" providers to select a particular diagnosis. *See* <u>Exhibit 46</u>.

157.   According to AHIMA's Managing an Effective Query Practice Brief, "Queries that appear to lead the provider to document a particular response could result in allegations of inappropriate upcoding. The query format should not sound presumptive, directing, prodding, probing, or as though the provider is being led to make an assumption." <u>Exhibit 42</u> at REL0000511.

158.   In *Health Information Management Compliance: A Model Program for Healthcare Organizations,* AHIMA's Sue Bowman writes that "Communication tools between coding personnel and physicians, such as coding summary sheets, attestation forms, or coding clarification forms (*e.g.*, physician query forms), should never be used as a substitute for appropriate physician documentation in the health record."

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

159.   Nevertheless, some of the Kaiser regions developed sets of query "templates" for clinical documentation improvement (CDI) staff for specific HCC diagnoses to use in concurrent querying of providers that do just that. These improper query templates were used in at least Kaiser's NCAL hospital CDI and Northwest CDI, and perhaps others. There is a cultural reluctance within NCO to give direction and/or require the Kaiser Regions to utilize the Kaiser standard query form language for coding and CDI.

160.   The hospital coding staff also utilizes templated physician queries, but these query templates are reviewed and constructed to ensure non-leading language for a variety of diagnoses, regardless of payer type or reimbursement impact. Most of the query reviews of language utilized were under the oversight of Ms. Bryant and guidance of Ms. Hernandez, always utilizing, communicating, and applying the AHIMA direction, guidance and practice briefs.

161.   KP NCAL and Northwest CDI query templates developed by TPMG and the Northwest PMG, respectively, many of which involve diagnoses directly linked to HCCs under the Medicare Advantage program and HHS-HCCs under the Affordable Care Act, are designed to be, and are in fact, leading. Through the queries, CDI staff introduce clinical indicators for specific HCC diagnoses to the providers, who in turn routinely follow the suggestion to add a reimbursable diagnosis where none existed and should not have been added. In Kaiser's NCAL Region, the CDI queries are not made an official permanent part of the record while HIM coding queries are, thus obscuring the role of CDI and improper querying from review.

162.   Although the role of CDI staff is to seek clarification from providers for documentation for specific clinical indicators, there has been inconsistent application of the Practice Brief Guidance at Kaiser. These queries are always, or almost always, directed toward an HCC diagnosis for maximizing reimbursement capture and not for overall quality documentation for all clinical situations, all payers, and all patients. In fact, Ms. Bryant recalls on several occasions a stated reluctance from Kaiser's Revenue Cycle leaders to look at documentation and coding both ways – *e,g,*, for both over- and under coding – on the basis that it is too costly and time consuming. Moreover, Kaiser's CDI program is not a "payer agnostic" approach. TPMG in Kaiser's NCAL Region, for example, limits its CDI focus to HCCs only and never expanded to

48

examine severity of illness (SOI) and risk of mortality (ROM) to all patients and to all payers, notwithstanding Ms. Bryant's strong recommendations,

163.    Examples of the leading query templates include Kaiser's templates for: obesity/extreme or morbid obesity; protein calorie malnutrition (mild/moderate/severe); pressure ulcer; neoplasm (history versus current); emphysema; depression; adrenal mass; aortic atherosclerosis; diabetes manifestations; neutropenia; sepsis/SIRS with organ dysfunction, and others. *See* Exhibit 47 (improper query templates from Kaiser's Northwest region, operated by the Northwest PMG); Exhibit 36 (TPMG CDI Tip Sheet).

164.    Moreover, certain query templates in Kaiser's Northwest Region developed by the Northwest PMG include leading language introducing a diagnosis to the physician, and not including options of "unknown," "other," "clinically undetermined" or "unspecified."    They contravene AHIMA's guidance on Achieving a Compliant Query Process, which states that *"Multiple choice query formats should include clinically significant and reasonable options as supported by clinical indicators in the health record, recognizing that there may be only one reasonable option....Multiple choice query formats should also include additional options such as 'clinically undetermined' and 'other' that would allow the provider to add free text.   Additional options such as 'not clinically significant' and 'integral to' may be included on the query form if appropriate."*

(ii)    ***Inquiries to AHA Coding Clinic***

165.    As discussed above in the Vent Dependence Status section, Kaiser chastised and reprimanded Ms. Bryant, Ms. Hernandez and other HIM coding professionals for submitting coding questions directly to the American Hospital Association Central Office for Coding Clinic, a routine and standard of practice for coding professionals across the country.   Ultimately, Kaiser instituted and mandated requirements for all AHA Coding Clinic questions, routing them through a rigorous review committee comprised primarily of non-coding professionals and many layers of approval process before submission.

166.     Ms. Bryant was directed that any and all coding questions must go through Kaiser's own Coding Governance Group ("CGG"), a group that was and is composed of a majority of physicians and representatives from Kaiser's Permanente Medical Groups rather than coding professionals.  In December 2013, Ms. Bryant was told by Kaiser TPMG's senior physician lead Dr. Bliss that she was "putting the organization at risk" by submitting questions directly to Coding Clinic, a sentiment echoed by TPMG Director Anne Cadwell on a call that also included many regional physicians and Revenue Cycle leaders.  Ms. Bryant's expertise, professional knowledge and career-long practice of submitting questions to Coding Clinic were thus called into question. Ms. Bryant commented to the group that it was her duty and responsibility as a coding professional, and a standard of practice, to submit questions for coding clarification to AHA Coding Clinic without a committee review.

167.     Ms. Bryant expressed concern on the December 2013 call that this internal group lacked coding expertise, and inserted a layer of bureaucracy in an area where Kaiser's National Coding group (led by Ms. Bryant) should have independence and the ability to send unattributed questions to Coding Clinic.  Her protests and professional rationale were ignored.

168.     Ms. Bryant reported back to Kaiser's NCAL HIM leadership, including Ms. Hernandez and Dawna Toews, regarding this new directive.  Her staff was appalled with the outcome of the meeting and felt that their credentials were at risk due to being prohibited from following ethical coding practices to seek and comply with official coding guidelines. *See* Exhibit 22. Under extreme pressure, Ms. Bryant reluctantly complied with the CGG request and worked with NCO's Nancy Andersen to develop a coding questions workflow over the coming years (started in 2014 and finalized in 2015, currently still under revision in 2017).

169.     The internal coding question workflow for submitting coding questions to Coding Clinic was discussed during a March/April 2015 conference call/meeting involving NCO's Diana Medal, Nancy Andersen, Ms. Bryant and Ms. Hernandez.  The group specifically discussed the restrictive and controlling nature of the CGG directive and how the physician members of the CGG were extremely apprehensive of Ms. Bryant sending questions to Coding Clinic due to their

concern that Coding Clinic's response might force Kaiser to change its HCC documentation and HCC capture practices.

170. NCO's Nancy Andersen mentioned that the CGG physician leader, Dr. Annette Guido, was behind the restriction that had been imposed and that she (Ms. Andersen) did not entirely agree with it, but that the physicians' directive had to be followed. Ms. Bryant stated her concerns with the CGG being composed mostly of physicians and not coding experts, a point with which Ms. Andersen agreed. On the same call, Ms. Hernandez discussed her concern that TPMG had been focusing on HCCs and had restricted her in the past from collaborating outside TPMG EIO (*i.e.*, with Ms. Bryant, Ms. Anderson and NCO), much less submit a question to Coding Clinic, and felt that TPMG feared that the Coding Clinic response or guidance would derail its capture efforts of HCC diagnoses. Ms. Andersen stated that she understood but "we have no choice." She stated that it was difficult to get the medical groups and CGG to understand the need to query AHA Coding Clinic directly and freely.

171. When Ms. Hernandez requested a copy of the recording of the conference call several days later, Ms. Medal stated via email that it had been deleted per the instructions of Ms. Andersen. Ms. Bryant and Ms. Hernandez believe that the recording was deleted due to the fact that many comments were made during the call, including by NCO leadership, that were highly critical of CGG's and TPMG's leadership and practices.

(iii) **Evaluation and Management ("E&M") levels – Medi-Cal Upcoding**

172. E&M coding is the process by which physician-patient encounters are translated into Current Procedural Terminology ("CPT") codes to facilitate billing to Medi-Cal and other payers. There are five E&M levels of service relevant to full encounter data submission. Choosing the proper level is critical for proper reimbursement for Medicare Part B, Medicaid (including Medi-Cal) and other payers. Coding data is also used for analysis of future payment methodology by the Medicare system, and is used to determine per member, per month rates under Medi-Cal for managed care organizations like Kaiser.

173.    Kaiser's policy systematically ignores one-level E&M differences.  Kaiser requires an audit corrective action plan only when the E&M level is off by two or more levels. This is a Permanente Medical Group practice across all Kaiser Regions in non-hospital settings and was a decision made by the Permanente Medical Group Federation comprised of all regional medical groups.  Further, Kaiser requires internal and third-party audits to reflect accuracy/error rates using the Kaiser E&M leveling standard, rather than the CMS standard for error determination.  This has the capacity, if not the likelihood, of misleading a reader of audit results into believing that Kaiser's E&M coding is substantially more accurate than it really is, and that no corrective action is required when it is.

174.    When the Northwest Region's Revenue Cycle director requested Ms. Bryant's input and advice on the Northwest Region's audit approach with one-level E&M change, Ms. Bryant expressed her concerns with this practice and stated that a one-level E&M change should be counted in the accuracy rate determination.  Ms. Bryant's believes that her feedback was ignored.

175.    In December 2016, Ms. Bryant led a Washington Region physician practice coding validation audit utilizing a third-party vendor, under the support of the Vice President of Revenue Cycle, Doug Murphy.  The findings from this audit identified E&M level changes, including one-level changes, that were counted as errors in the overall accuracy rate.  When the audit findings were summarized and presented to the Washington PMG and Kaiser Revenue Cycle Senior Leadership, Ms. Bryant was questioned repeatedly on the E&M level error rate.

176.    Linda Medina, Vice President of Revenue Cycle for the Southern California Region told Ms. Bryant that Kaiser has a long history with the Permanente Medical Groups of not counting a one-level E&M error in the accuracy rate and that she (Ms. Bryant) needs to get on board with this practice.  Ms. Bryant told Ms. Medina and Mr. Murphy that maybe it was time for Kaiser to change its practice instead of continuing to inaccurately report audit findings, as a one-level change is an error that counts in the accuracy rate determination and is industry standard. Ms. Bryant provided Medicare audit guidance that supported this position which she provided directly to her supervisor, Mr. Murphy, and requested that it be shared with Ms. Medina and

52

others.   Again, Ms. Bryant believes that her feedback was ignored, and further believes that validation audit's accuracy results were manipulated to exclude one-level E&M coding errors.

177.   In 2017, Ms. Hernandez was informed by a TPMG EIO Manager that Kaiser is now counting **two** levels of E&M error as acceptable and does not count such errors toward the accuracy rate in audits.

### B.   *Kaiser's emphasis on financial outcomes*

178.   At every level of the company, Kaiser emphasizes financial results over compliance and accuracy, bending the rules and utilizing gaming strategies to falsely engineer profits.

### (i)   *CDI program and related activities.*

179.   In late 2009, Kaiser NCAL Revenue Cycle developed its "Clinical Documentation Improvement" program, which it called "Clinical Documentation Integrity" or "CDI," to ostensibly improve its clinical documentation of hospital inpatient medical encounters. This effort was followed by the SCAL and Northwest Regions in the hospital setting.   In actuality, Kaiser's CDI programs strive only to improve clinical documentation insofar as it increases HCC capture and Medicare and HHS reimbursement.

180.   AHIMA's guidance on CDI programs provides that they are required to address all payers, not just Medicare.   In addition, CDI programs should not focus solely on reimbursement.   In furtherance of this guidance, the original NCAL CDI program initially developed by Ms. Bryant in 2009 was designed to achieve a payer-agnostic focus by the end of a three-year plan.   But Kaiser's CDI program, in practice, has diverged from Ms. Bryant's expertise and design and is definitively <u>not</u> "payer agnostic."   It focuses almost exclusively on risk-adjusted payers, such as HHS under the ACA program and CMS under the Medicare Advantage program, and only on documentation impacting HCCs.

181.   Ms. Bryant made several requests to expand Kaiser's CDI program to other payers and not to focus solely on HCC reimbursement, but was not successful.   In approximately late 2010, Kaiser NCAL Revenue Cycle Vice President Dave Nyburg moved the CDI Program

from Ms. Bryant's oversight to his direct oversight. Ms. Bryant believes that this move was made due to ongoing TPMG discomfort with the direction she wanted to move the program and the pressure and resistance to Ms. Bryant's advice and guidance.

182. Moreover, in the past, Kaiser's CDI program conducted its concurrent documentation reviews by going into prior or old encounters and pulling diagnostic and clinical information to query physicians for the current encounter for HCC diagnosis capture. Again, this contravenes coding guidelines and AHIMA Standards of Ethical Coding under section 4.5: Coding professionals shall not "*Utilize health record documentation from or in other encounters to generate a provider query.*" *See* Exhibit 46.

183. For example, Ms. Hernandez received multiple inquiries from CDI leadership and CDI nursing staff as to whether they may use old lab values, clinical indicators and documentation from previous encounters and apply these to send a query about a different, current encounter. Ms. Hernandez has repeatedly told CDI leadership staff that this is not appropriate. But the repeated nature of the inquiries gave rise to Ms. Hernandez's belief that the CDI program was routinely looking backwards; it was highly unlikely that the CDI leadership was getting to every instance and every CDI employee to provide Ms. Hernandez's guidance.

184. For many years, Kaiser's CDI program, especially in the NCAL region, has consistently expressed the value of its work in terms of additional dollars captured, not in improved quality of care, patient safety, severity of illness, improved mortality scores, compliant documentation, or outcomes.

185. For example, in a July 2010 NCAL presentation "CDI Prioritization for Roll Out," Kaiser's NCAL CDI group analyzed the results of an internal audit of inpatient "HCC underpayment." The presentation quantified the impact of the HCC codes that had been "recaptured" in the audit in terms of how much additional revenue that meant for the company. The presentation did not mention compliance or identify any HCC overpayment. *See* Exhibit 48.

186. In a Kaiser NCAL "CDI Program: Update" presentation in December 2011, the company emphasized in its Key Findings that the program had generated year-to-date 2011 revenue of "$27.80 million." *See* Exhibit 11. The presentation even quantified the "Top CDI

Queries" by HCC in terms of the "Revenue Impact" to the company, with sepsis near the top of the list. CDI Program Updates have followed the same format and included these same metrics for many years.

**(ii)** ***Kaiser's RRG meetings and Regional Competitions for Revenue/HCC Capture.***

187. In approximately 2008-2009, Kaiser formed Regional Reporting Group ("RRG"), comprised of senior personnel from the Health Plan, Permanente Medical Groups and Revenue Cycle of each region with the focus of Medicare Advantage Finance Risk Adjustment. The RRG meetings were initially led by Dr. Simon Cohn until his retirement in 2015, after which the RRG was led by Dr. Annette Guido of Kaiser's Northwest Region, along with Hovannes Daniels, Kaiser's Medicare Finance VP under Kaiser's Health Plan.

188. The RRG meets regularly to share regional "best practices" on how to capture more HCC conditions, diagnoses, and codes, and thus to increase Kaiser revenue. This was and is the top focus of these high-level meetings. Other topics discussed are risk scores and Risk-Adjustment Data Validation (RADV) audits, regulatory changes, comparing regions to each other, and reviewing financial and HCC targets.

189. "Best practices" often contain improper and inaccurate querying, documentation, and coding practices. Certain HCC conditions and diagnoses are specifically targeted at the RRG meetings for their financial impact and discussed and compared with the other regions. Ms. Bryant recalls a RRG meeting where a regional physician leader made a presentation which contained inaccurate documentation and coding information. Ms. Bryant took her concerns about the presentation to Janet D. Franklin of Kaiser's NCO. Ms. Franklin agreed that Ms. Bryant was correct but said that that they could not say anything here at the RRG meeting in front of the Permanente Medical Groups. Ms. Bryant told Janet Franklin that she was concerned with that approach in that there was a large audience in many regions who would think that the presentation had correct information. Ms. Franklin agreed, but said that there was nothing that could be done.

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

190.   Kaiser's various regions, including especially its NCAL (TPMG) and Southern California regions (SCPMG), compete with each other on which region manages to capture the highest number of HCCs and improved risk scores.   Monthly or Bi-monthly WebEx meetings and report outs are generated showing the results of the risk-adjustment metrics, as well as goals and targets for regional HCC capture over the next period.   In addition, the regions compete in the third and fourth fiscal quarters each year as to their metrics on capturing chronic conditions and HCCs, and improving scores and revenue, metrics which are also discussed and presented at RGG meetings.

 (iii) ***Employee and management bonuses.***

191.   Ms. Bryant and Ms. Hernandez believe and therefore allege that Kaiser's NCAL region, including TPMG, gives bonuses to employees and leadership near year-end that are tied to the overall financial goals and success of the Kaiser region.   They therefore believe and allege from their experience working in TPMG that bonuses are related, directly or indirectly, to HCC and revenue capture.

 (iv) ***Kaiser's regional medical groups dominate over Kaiser's compliance function.***

192.   In June 2013, Nancy Andersen, Kaiser's National Compliance manager, told Ms. Hernandez that the regional Permanente Medical Groups choose what and how to be audited. She told Ms. Hernandez that "she knows where the bodies are buried," but that the National Compliance Office has no power over the Permanente Medical Groups.   This is exactly the opposite of how the compliance function should operate in a compliant organization.   In 2016, Ms. Andersen confirmed to Ms. Bryant that Kaiser's Permanente Medical Groups continue to be "rabid for HCCs" and that Kaiser's NCO group has no power to focus the organization on compliance.

## C. *Kaiser improperly employs technology to further its HCC and revenue capture.*

 (i) ***Data mining.***

193.    In 2014-2015, Kaiser's TPMG EIO's "data mining" team, comprised largely of out-of-country doctors, used "algorithms" in the NCAL region to identify and capture possible missed HCCs to create "add files," referred to as "missed opportunities" by TPMG.   Ms. Hernandez believes and therefore alleges that this practice had been going on for many years.

194.    Also in 2014-2015, Ms. Hernandez witnessed TPMG utilizing foreign doctors, who were not licensed as physicians in the United States and may not have had current foreign licenses, to access the clinic encounters.   The foreign doctors would send "Dear Doctor" notes via KP Health Connect to the primary care physician asking them to add HCC diagnoses based on their reviews and using their algorithms.

195.    This process was improper and led to errors.   For example, as part of an NCO audit in 2015, Ms. Hernandez found documentation of sepsis added onto a clinic encounter four months after the patient was seen, with no supporting documentation as to how the HCC diagnosis was determined (*e.g.*, no lab values, signs/symptoms, treatment, clinical indicators, etc.). When Ms. Hernandez shared with her director, Anne Cadwell (TPMG EIO Director), that Ms. Hernandez agreed with NCO's finding that sepsis was improperly coded, Ms. Hernandez was told by Ms. Cadwell "never to agree" with an NCO audit, and if the topic came up, to just say "thank you." Ms. Hernandez asked what to enter in the audit response, given that she agreed with the finding.   Ms. Cadwell instructed Ms. Hernandez not to talk at the audit exit call and to only speak when Ms. Cadwell asked Ms. Hernandez to say something.

(ii)    ***Improper Carry-Over From Prior Years.***

196.    In 2014-2015, Ms. Hernandez discovered that in Kaiser's NCAL TPMG region, Kaiser's "Business Intelligence Team" ("BIT") generated questionable "block" files and "add" files for resubmission to CMS based on algorithms.   The process they used may have improperly carried over HCCs from previous years to the current year without physician validation or a face-to-face encounter.

197.    Ms. Hernandez was part of the TPMG EIO Director email distribution list where medical record diagnoses files were emailed to the directors asking for approval for "add"

or "block" files, which Ms. Hernandez never approved.  To Ms. Hernandez' knowledge, "add" files were created based on algorithms run by the BIT team (*e.g.*, diabetes with manifestations, etc.), and automatically carried from the previous year to the current year's problem list even where patients were not seen face-to-face as required under the Medicare Advantage program.

### (iii)   *Computer Assisted Coding*

198.   Computer Assisted Coding (CAC) is a natural language processing technology utilized as a tool to assist the coding professional to confirm and select ICD and CPT codes based on words and language used in the medical record.  CAC identifies wording and/or full sentences within the electronic health record which contains signs, symptoms, diagnoses and procedures for which a code may possibly be assigned once confirmed and validated by the coding professional. CAC was identified and implemented by Kaiser as a valuable tool and asset to increase coding productivity, coding accuracy, and HCC capture.

199.   In approximately 2013, during the pilot phase of CAC implementation in Kaiser's NCAL region, Ms. Hernandez conducted auditing and validation of the resulting diagnoses and codes, along with Ms. Sheryl Roy (Regional NCAL HIM employee at the time). Ms. Hernandez and Ms. Roy determined that CAC was capturing and overcoding diagnoses with an overall poor accuracy rate (60% or less).  They shared their findings with Ms. Bryant, who agreed with their concerns.

200.   During a CAC quality assurance meeting, which was held via recorded webex, Ms. Bryant, Ms. Hernandez and Ms. Roy reported their audit findings and concerns to NCAL Revenue Cycle Charge Capture Manager, Gina Sandler, and Revenue Cycle Integrity Director, Diane Ott, who were members of Kaiser's CAC implementation team. Ms. Sandler typed meeting minutes during the call.  Ms. Hernandez and Ms. Roy later discovered that the audit results and their concerns had been excluded from the meeting minutes. Moreover, they discovered that Ms. Sandler and Ms. Ott had manipulated the actual audit results to indicate a higher accuracy rate.   Ms. Hernandez and Ms. Bryant believe and therefore allege that the audit results were manipulated and their concerns were ignored so as to avoid identification of any

problems with CAC which might delay its full implementation at Kaiser. Ms. Bryant and Ms. Hernandez voiced their concerns to NCAL Revenue Cycle Leadership and to Kaiser's NCO leadership (Ms. Anderson), but were ignored.

201.   Ultimately, Kaiser's CAC implementation moved forward in 2014 on outpatient and inpatient encounters. After 18 months to two years of constant problems with CAC, the hospital coding and auditing staff expressed outrage with the continued inaccuracy and their mistrust of the CAC tool. These complaints resulted in NCAL Revenue Cycle Leadership finally discontinuing CAC in hospital outpatient encounters in 2016.

202.   Ms. Bryant and Ms. Hernandez believe and therefore allege that Kaiser never went back to correct the many inaccurate codes generated by the Kaiser's flawed CAC processes.

### D.   *The Kaiser Defendants Acted With Intent.*

203.   The Kaiser Defendants acted with intent in over-charging the United States, the State of California, and other government programs, and retaining and failing to return such overpayments. Kaiser's entire corporate culture is built around "mining for", "gaming" and "capturing" codes even when they are not validly supported or documented, training its physicians to over-diagnose and falsely document diagnoses, elevating its profits over its compliance function, and motivating employees through the setting of metrics and, upon information and belief, utilizing bonuses for successful code and revenue capture. The specific schemes described above engineered by Kaiser regarding aortic atherosclerosis, vent dependent status, protein-calorie malnutrition, sepsis and sepsis with organ dysfunction, acute renal failure and others evidence Kaiser's intentional, systematic efforts to circumvent proper documentation and coding practices and Medicare, Medicaid and Medi-Cal law. Moreover, although Kaiser has a National Compliance Office with hundreds of staff, there are huge holes and gaps in the effectiveness of its compliance program, which is subverted to the profit goals of Kaiser's medical groups.

### E.   *Kaiser's Fraud Was and Is Material to the Government's Payment Decision*

204.   The United States and the State of California, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, their agents, employees, and co-conspirators, and as a result thereof, have paid money that they otherwise would not have paid. For example, CMS would have refused to make risk adjustment payments, in whole or in part, to the Kaiser Defendants if it had known that the Kaiser Defendants were falsifying documentation and coding as alleged in this Complaint.   The fraudulent diagnostic data and coding submitted by the Kaiser Defendants constituted a substantial portion of all of the diagnostic data and coding submitted by the Kaiser Defendants to the government.   Given that diagnostic data and coding is the sole determinant in the calculation of any risk adjustment payment based on a beneficiary's health status, the government's payment decision necessarily would have been different had the government known that the data and coding were false.

205.   Moreover, CMS makes reconciliation payments to the Kaiser Defendants based on the diagnostic data submitted.   Those payments are adjusted to account for invalid diagnoses codes that providers such as Kaiser submit.   If the Kaiser Defendants had complied with their obligation to delete invalid diagnoses from RAPS, Medicare would have processed the corrected data, recalculated the risk score for the beneficiaries, and the risk adjustment reconciliation payment system would have made the corresponding payment adjustment.   But when the Kaiser Defendants did not delete invalid diagnoses from RAPS, Medicare paid for the invalid diagnoses as part of its final reconciliation payment to the Kaiser Defendants.   If the Kaiser Defendants had corrected their invalid diagnoses, CMS would have processed the corrected data to produce accurate risk scores for beneficiaries, which necessarily would have changed the risk adjustment payments for those beneficiaries.

206.   The risk adjustment attestations submitted by the Kaiser Defendants each year are a reminder to the Kaiser Defendants of their obligation to submit valid data and to promptly correct invalid data.   They also have a direct impact on the government's risk adjustment payments.   For example, if CMS knew that the Kaiser Defendants' attestations were false, CMS's risk adjustment payments would have changed in that CMS would have refused to make risk adjustment payments to the Kaiser Defendants, in whole or in part.

207.   The materiality of the Kaiser Defendants' fraud is further established by the fact that the United States has filed suit against other managed care organizations over similar documentation and coding fraud as alleged herein.

## FIRST CLAIM FOR RELIEF

### False Claims Act: Presentation of False or Fraudulent Claims

### U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))

208.   The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 208 above as though they are fully set forth herein.

209.   Defendants violated 31 U.S.C. § 3729(a)(1)(A) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) presented or caused to be presented a false or fraudulent claim for payment or approval. Specifically, Defendants knowingly presented or caused to be presented a false or fraudulent Risk Adjustment Attestation to the United States in order to receive and retain risk adjustment payments from the Medicare Program.

210.   Defendants violated former 31 U.S.C. § 3729(a)(1) as follows: Defendants knowingly presented, or caused to be presented, to the United States a false or fraudulent claim for payment or approval. Specifically, Defendants knowingly presented or caused to be presented a false or fraudulent Risk Adjustment Attestation to the United States in order to receive and retain risk adjustment payments from the Medicare Program.

211.   The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

212.   By virtue of the said false or fraudulent claim, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

## SECOND CLAIM FOR RELIEF

### False Claims Act: Making or Using False Records or Statements

### U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))

213.    The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 213 above as though they are fully set forth herein.

214.    Defendants violated 31 U.S.C. § 3729(a)(1)(B) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim. Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to a false or fraudulent claim for risk adjustment payments from the Medicare Program.

215.    Defendants violated former 31 U.S.C. § 3729(a)(2) as follows: Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States. Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation to get a false or fraudulent claim for risk adjustment payments paid or approved by the Medicare Program.

216.    The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

217.    By virtue of the said false record or statement, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### THIRD CLAIM FOR RELIEF

#### False Claims Act: Conspiracy

#### U.S.C. § 3729(a)(1)(C) (formerly 31 U.S.C. § 3729(a)(3))

218.     The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 218 above as though they are fully set forth herein.

219.     Defendants violated 31 U.S.C. § 3729(a)(1)(C) as follows: Defendants conspired with one another to commit a violation of 31 U.S.C. § 3729(a)(1)(A), (B), and/or (G), as those violations are specifically alleged in Claims I, II, and IV of this Complaint.

220.     Defendants violated former 31 U.S.C. § 3729(a)(3) as follows: Defendants conspired with one another to defraud the United States by getting a false or fraudulent claim allowed or paid. Specifically, Defendants conspired with one another to defraud the United States by getting risk adjustment payments from the Medicare Program based on a false or fraudulent claim for risk adjustment payments and/or a false or fraudulent Risk Adjustment Attestation.

221.     The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

222.     By virtue of the said conspiracy, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### FOURTH CLAIM FOR RELIEF

#### False Claims Act: Reverse False Claims

#### U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))

223.     The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 223 above as though they are fully set forth herein.

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

224.    Defendants violated 31 U.S.C. § 3729(a)(1)(G) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States. Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

225.    Defendants also violated 31 U.S.C. § 3729(a)(1)(G) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States. Specifically, Defendants knowingly concealed or improperly avoided or decreased an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

226.    Defendants violated former 31 U.S.C. § 3729(a)(7) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States. Specifically, Defendants knowingly made, used, or caused to be made or used, a false Risk Adjustment Attestation to conceal, avoid or decrease an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

227.    The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

228.    By virtue of the said false record, statement, and other acts of concealment and improper avoidance, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FIFTH CLAIM FOR RELIEF

**Violation of California False Claims Act: Presentation of False or Fraudulent Claims**

## California Government Code § 12651(a)(1)

229.   The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 229 above as though they are fully set forth herein.

230.   Defendants violated California Government Code § 12651(a)(1) as follows: Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval. Specifically, Defendants knowingly presented or caused to be presented false and excessive billings paid or approved by Medi-Cal.

231.   The State of California, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

232.   By virtue of the said false or fraudulent claim, the State of California incurred damages and therefore is entitled to multiple damages under the California Government Code § 12651, plus a civil penalty for each violation of the Act.

## SIXTH CLAIM FOR RELIEF

**Violation of California False Claims Act: Making or Using False Records or Statements**

## California Government Code § 12651(a)(2)

233.   The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 233 above as though they are fully set forth herein.

234.   Defendants violated California Government Code § 12651(a)(2) as follows: Specifically, Defendants knowingly made, used, and/or caused to make or use false records and statements to get false and excessive billings paid or approved by Medi-Cal.

235. The State of California, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

236. By virtue of the said false or fraudulent claim, the State of California incurred damages and therefore is entitled to multiple damages under the California Government Code § 12651, plus a civil penalty for each violation of the Act.

## SEVENTH CLAIM FOR RELIEF

### Violation of California False Claims Act: Conspiracy

### California Government Code § 12651(a)(3)

237. The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 237 above as though they are fully set forth herein.

238. Defendants violated California Government Code § 12651(a)(3) as follows: Defendants conspired with one another to commit a violation of California Government Code § 12651(a)(1), (2) and/or (7), as those violations are specifically alleged in Claims V, VI, and VIII of this Complaint. Specifically, Defendants violated California Government Code § 12651(a)(3) as follows: Defendants conspired with one another to defraud the State of California by getting a false or fraudulent claim allowed or paid.

239. The State of California, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

240. By virtue of said conspiracy, the State of California incurred damages and therefore is entitled to multiple damages under the California Government Code § 12651, plus a civil penalty for each violation of the Act.

# EIGHTH CLAIM FOR RELIEF

## Violation of California False Claims Act: Reverse False Claims

## California Government Code § 12651(a)(7)

241.    The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 241 above as though they are fully set forth herein.

242.    Defendants violated California Government Code § 12651(a)(7) as follows: Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of California. Specifically, Defendants knowingly and improperly retained and concealed excessive capitated payments that Defendants received from Medi-Cal.

243.    Defendants also violated California Government Code § 12651(a)(7) as follows: Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State of California. Specifically, Defendants knowingly made, used and/or caused to make or use false records and statements to conceal, avoid, or decrease their obligation to return to the Medi-Cal program the excessive capitated payments Defendants received from Medi-Cal.

244.    The State of California, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

245.    By virtue of the said false or fraudulent claim, the State of California incurred damages and therefore is entitled to multiple damages under the California Government Code § 12651, plus a civil penalty for each violation of the Act.

## NINTH CLAIM FOR RELIEF

**False Claims Act: Relief From Retaliatory Actions Against Defendant TPMG**

**U.S.C. § 3730(h)**

246.     Relator Victoria M. Hernandez repeats and re-alleges the allegations contained in Paragraphs 1 – 246 above as though they are fully set forth herein.

(a)     31 U.S.C. § 3730(h), Relief From Retaliatory Actions, provides:

(i)     In general.— Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

(ii)     Relief.— Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

247.     Ms. Hernandez was employed by the Kaiser Defendants from June 1995 through October 2015.  From January 2000 forward, Ms. Hernandez's was employed in various coding leadership positions.

248.     Ms. Hernandez received stellar employment reviews throughout her career with Kaiser until she was hired into Kaiser's TPMG organization.  In her last year of Kaiser employment (October 2014 through October 2015), the only year that she worked at Kaiser's TPMG subsidiary, Ms. Hernandez was criticized for purported lack of communication and, at the

1   same time, also reprimanded for communicating her concerns about TPMG's coding and auditing
2   functions.

3       249.   This review came after, and was the direct result of, Ms. Hernandez
4   observing and reporting internally several of the coding errors and systemic fraud detailed herein
5   committed at and by Kaiser and its affiliates, including TPMG.

6       250.   The poor review was improper retribution for Ms. Hernandez's efforts to
7   bring to the attention of leadership the deceptive and fraudulent practices within Kaiser. She was
8   set up to be terminated for reporting what she observed even though she had been asked by TPMG
9   leadership to stop looking for another job. Ms. Hernandez felt harassed, disrespected, and bullied.
10  She was subjected to threats and intimidation by TPMG leadership.

11      251.   In October 2015, in anticipation of being terminated, and due to Kaiser
12  TPMG's intimidation and harassment, she resigned her position with Kaiser.

13      252.   Ms. Hernandez engaged in protected activity by, among other things,
14  reporting to multiple Kaiser supervisors her concerns that Kaiser was submitting illegal, unlawful
15  and/or false claims to the Government in an effort to stop Kaiser from presenting or causing to be
16  presented to the Government false or fraudulent claims for payment or approval, and from making,
17  using or causing to be made or used, a false record or statement material to a false or fraudulent
18  claim.

19      253.   Kaiser TPMG knew that Ms. Hernandez engaged in the above described
20  protected activity.

21      254.   Kaiser TPMG discharged, demoted, threatened, harassed, and otherwise
22  discriminated against Ms. Hernandez as a result of her protected activities.

23      255.   As a result of Kaiser's unlawful actions, Ms. Hernandez has suffered a loss
24  of employment opportunities and earnings and a loss of future earnings and earning capacity, and
25  Ms. Hernandez has suffered, and continues to suffer, non-monetary damages, including, but not
26  limited to, emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of
27  enjoyment of life.

28

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

### TENTH CLAIM FOR RELIEF

#### Violation of Cal. Lab. Code § 1102.5, *et seq.* Against Defendant TPMG

256.  Relator Victoria M. Hernandez repeats and re-alleges the allegations contained in Paragraphs 1 – 256 above as though they are fully set forth herein.

257.  In violation of Cal. Lab. Code § 1102.5, Defendant TPMG, by and through its principals, agents and employees, retaliated against Ms. Hernandez for having opposed, resisted, and complained of the acts alleged herein.

258.  Defendant TPMG retaliated against Ms. Hernandez for opposing and refusing to participate in Defendant's violations of state and federal statutes and/or rules and regulations.  In contesting Defendant's violations, Ms. Hernandez was engaged in protected activity.  Under Cal. Lab. Code § 1102.5, Defendant TPMG is prohibited from retaliation against Ms. Hernandez for opposing any practices forbidden or made unlawful under Cal. Lab. Code § 1102.5.

259.  In taking the actions alleged herein, Defendant TPMG acted with malice, fraud and oppression, and in reckless disregard of Ms. Hernandez's rights, entitling her to an award of punitive damages.

260.  As a result of Defendant TPMG's unlawful actions, Ms. Hernandez has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and Ms. Hernandez has suffered, and continues to suffer, non-monetary damages, including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of enjoyment of life.

### ELEVENTH CLAIM FOR RELIEF

#### Violation of Cal. Lab. Code § 98.6 Against Defendant TPMG

261.  Relator Victoria M. Hernandez repeats and re-alleges the allegations contained in Paragraphs 1 – 261 above as though they are fully set forth herein.

262. In violation of Cal. Lab. Code § 98.6, Defendant TPMG, by and through its principals, agents and employees, retaliated against Ms. Hernandez for having opposed, resisted, and complained of the acts alleged herein.

263. After Ms. Hernandez complained about and objected to Kaiser's practices detailed herein and in response to such complaints and objections, Defendant TPMG subjected her to ongoing retaliation, including but not limited to ostracism and the threat of termination.

264. In taking the actions alleged herein, Defendant TPMG acted with malice, fraud and oppression, and in reckless disregard of Ms. Hernandez's rights, entitling her to an award of punitive damages.

265. As a result of Defendant TPMG's unlawful actions, Ms. Hernandez has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and Ms. Hernandez has suffered, and continues to suffer, non-monetary damages, including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of enjoyment of life.

## TWELFTH CLAIM FOR RELIEF

### Violation of Fair Labor Standards Act Against Defendant TPMG

### 29 U.S.C. § 215

266. Relator Victoria M. Hernandez repeats and re-alleges the allegations contained in Paragraphs 1 – 266 above as though they are fully set forth herein.

267. In violation of the Fair Labor and Standards Act of 1939 ("FLSA"), Defendant TPMG, by and through its principals, agents and employees, retaliated against Ms. Hernandez in constructively discharging her for having opposed, resisted, and complained of the acts alleged herein, including numerous violations of federal law and rules and regulations.

268. In making the above-described internal complaints, Ms. Hernandez was engaged in a protected activity under the FLSA. Defendant TPMG willfully continued to mask its violations after Ms. Hernandez apprised Defendant of the extent of Defendant's non-compliant

practices.   Ms. Hernandez subsequently suffered an adverse employment action when she was constructively discharged from her employment by Defendant in retaliation for making said complaints and refusing to accede to Defendant's masking of its unlawful practices.

269.   In taking the actions alleged herein, Defendant TPMG acted with malice, fraud and oppression, and in reckless disregard of Ms. Hernandez's rights, entitling her to an award of punitive damages.

270.   As a result of Defendant TPMG's unlawful actions, Ms. Hernandez has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and Ms. Hernandez has suffered, and continues to suffer, non-monetary damages, including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of enjoyment of life.

### **PRAYER**

**WHEREFORE,** *qui tam* plaintiffs Gloryanne Bryant and Victoria M. Hernandez pray for judgment against Defendants as follows:

On Claims I, II, III, and IV (False Claims Act), against all Defendants jointly and severally:

- for the amount of the United States' damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

- for Relators to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

- for Relators to be awarded all costs of this action, including attorneys' fees and expenses;

- and for the United States and Relators to receive all such other relief as the Court deems just and proper.

On Claims V, VI, VII, and VIII (California False Claims Act), against all Defendants jointly and severally:

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

- for the amount of the State of California's damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;
- for Relators to be awarded the maximum amount allowed pursuant to California Government Code § 12651of the California False Claims Act;
- for Relators to be awarded all costs of this action, including attorneys' fees and expenses;
- and for the State of California and Relators to receive all such other relief as the Court deems just and proper.

Further, on Claims IX, X, XI, and XII, Plaintiff-Relator Ms. Hernandez, on her own behalf, demands that judgment be entered in her favor and against Defendant The Permanente Medical Group, Inc. granting the following relief:

- An award of back pay with prejudgment interest;
- An award of front pay in lieu of reinstatement;
- An award of general damages to compensate Ms. Hernandez for the mental and emotional distress caused by Defendant TPMG's misconduct;
- An award of punitive damages to deter and punish Defendant TPMG;
- An award of double, treble, exemplary, and/or punitive damages pursuant to 31 U.S.C. § 3730(h)(2), the California Labor Code, and the FLSA;
- An award of attorneys' fees and costs pursuant to 31 U.S.C. § 3730(h)(2), the California Labor Code, and the FLSA; and
- An award of such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Relators hereby demand a trial by jury as to all issues.

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT

Dated:  February 28, 2018

Respectfully submitted,

GLORYANNE BRYANT and
VICTORIA M. HERNANDEZ

By _____

Peter Rukin (Cal. Bar No. 178336)
RUKIN HYLAND
1939 Harrison Street, Ste. 290
Oakland, California  94612
(415) 421-1800
prukin@rukinhyland.com

Matthew K. Organ (pro hac vice to be submitted)
Roger A. Lewis (pro hac vice to be submitted)
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000
matthew.organ@goldbergkohn.com
roger.lewis@goldbergkohn.com

Brian M. Melber (pro hac vice to be submitted)
PERSONIUS MELBER LLP
2100 Main Place Tower
350 Main Street
Buffalo, New York  14202
(716) 855-1050
bmm@personiusmelberg.com

*Counsel for Plaintiffs-Relators*

COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
AND CALIFORNIA FALSE CLAIMS ACT